## Case No. 17,006.

VOSE et al. v. ALLEN.

[3 Blatchf. 289;[1] 34 Hunt, Mer. Mag. 450.]

Circuit Court, S. D. New York. June 14, 1855.[2]

AFFREIGHTMENT—DELIVERY OF CARGO—LOSS BY OVERLOADING WHARF.

1. The master of a vessel is bound not only to select a customary wharf for the delivery of a cargo carried on freight. but the place selected must be fit and safe for its deposit, and it must be discharged with all proper care and skill.

[Cited in Kennedy v. Dodge, Case No. 7,701: Irzo v. Perkins, 10 Fed. 780; Devato v. Eight Hundred and Twenty-Three Barrels of Plumbago, 20 Fed. 516. Distinguished in The City of Lincoln, 25 Fed. 838. 839. Cited in The Mascotte. 2 C. C. A. 401, 51 Fed. 608.]

[Cited in brief in Michigan, S. & N. I. R. Co. v. Bivens, 13 Ind. 271.]

2. Where the consignee of a cargo of iron shipped on freight refused to have any thing to do with its delivery at the wharf where the master was delivering it, and the master overloaded the.

---

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

2 [Affirming Case No. 17,005.]

wharf, so that it broke down, and a portion of the iron was totally lost: *Held*, that the owner of the vessel was responsible to the consignee for the loss, on a libel in admiralty in the district court, the consignee having made advances on the consignment.

[Cited in Young v. Lehmann, 27 Fed. 385.]

[Appeal from the district court of the United States for the Southern district of New York.]

This was a. libel in personam, filed in the district court, against Thomas Allen, owner of the barque Majestic, to recover damages for the non-delivery of a quantity of pig iron. After a decree by the district court in favor of the libellants [Case No. 17,005], the respondent appealed to this court.

Erastus C. Benedict, for libellants.
Francis B. Cutting, for respondent.

NELSON, Circuit Justice. The iron in question in this case was shipped at Belfast, Ireland, by a house there, to this port, and consigned to the libellants. The ship was consigned to Edmiston Brothers, of this city, agents of the owner. The bill of lading was in the usual form, except a note on the margin, "iron to be discharged by consignees in five days after arrival of vessel at New York, or pay demurrage of $25 per day after that time." But this clause is of no special importance, in the view I have taken of the case. On the arrival of the vessel, she was reported by the master to the consignees of the iron, with a request for advice as to the place of discharge. They expressed a wish that she should discharge at some dock between Washington Market and the Battery, which was assented to, provided a vacant berth could be obtained. But, on inquiry, the nearest berth vacant to the place mentioned was pier No. 39, on the North river; which was accordingly assigned to the vessel by one of the harbor-masters. The consignees objected to the delivery at that place, and insisted that the vessel should postpone it till pier No. 8 or No. 9, lower down, should be vacated, which, it was understood, might be in the course of a few days. This was not assented to by the agents of the ship, and the master commenced discharging the cargo at pier No. 39. This pier is about eight hundred feet long; the outer end. for some forty feet, solid; the other part built on piles, called a bridge-pier. The iron was discharged on this part of the pier. The delivery was commenced on Thursday morning, June 24th, and continued, during the day time, till eleven o'clock the next day, when the dockmaster, having noticed the quantity of iron on the pier, and being apprehensive it would give way under the weight, forbade the master's discharging any more of the cargo. The hands engaged knocked off for a time; but, in the afternoon, they again commenced the delivery, and continued until, again attracting the notice of the dock-master, they were forbidden the second time. They then ceased: but, the next morning, according to the weight of the proofs, they again commenced discharging, and continued till about eleven o'clock a. m., when the pier broke down, precipitating some one hundred and fifty tons of the iron into the river, about fifty tons of which have been totally lost. There were only some seventy-five or eighty tons upon the pier when warning of the danger was first given to the master. The master, at that time, gave notice to the consignees of the iron of the warning of the dockmaster, and requested that they would remove it from the pier, which they neglected or refused to do.

The simple question in the case is, whether or not this discharge of the iron, under the circumstances stated, was, in judgment of law, a delivery to the consignees, according to the requirements of the bill of lading. I think not. Assuming that the master was justified, under the general custom and usage of this port, in discharging the iron at pier No. 39, on the neglect or refusal of the consignees to procure a different one, more satisfactory to themselves, within a reasonable time, the responsibility for a safe delivery at the place selected rested upon him. He was bound not only to select a customary dock or wharf for the delivery of such goods as his ship was freighted with, but the place selected must be fit and safe for the deposit of them, and the cargo must be discharged with all proper care and skill. A discharge of the cargo short of this would be an abuse of the right which the custom of the port extends to the owner or master, in cases where the consignee refuses to accept or to participate in the delivery.

Nor did the master exempt himself from any portion of this responsibility by giving notice to the consignees of the danger from overloading the pier in the discharge of the iron. They had refused to have any thing to do with the delivery at that place. The master, therefore, was left to discharge the iron there, if at all, at his peril, without their assent or participation. If the pier was found insufficient for the discharge of the whole of the iron, a portion should have been delivered at some other place, and notice given to the consignees. This was an obvious suggestion, after the dock-master had forbidden any further discharge upon the pier at which the vessel lay; or, what might have answered the same purpose perhaps, the iron might have been distributed over a larger portion of the pier.

An objection is taken to the right of the consignees to bring this suit, and also to the jurisdiction of the court below to entertain it. I am satisfied, however, that neither objection is well founded. The consignees were the proper parties to bring the suit, having made advances upon the consignment; and, as to the jurisdiction, it is the common case of a libel filed for the non-performance of a contract of affreightment. I think that the decree of the court below is right and should be affirmed.

VOSE (CANNON v.). See Case No. 2,386a.
VOSE (DEDEKAN v.). See Case No. 3,732.