KENNEDY (BARCLAY v.). See Case No. 976.

KENNEDY (BAZIL v.). See Case No. 1,151.

KENNEDY (CALLAN v.). See Case No. 2,- 319.

---

## Case No. 7,701.

KENNEDY et al. v. DODGE et al.

[1 Ben. 311.][1]

District Court, S. D. New York. Aug., 1867.

DAMAGE TO CARGO — DELIVERY — NEGLIGENCE OF MASTER IN OVERLOADING PIER—RECOUPMENT.

1. Where a ship arrived in New York, with cargo consigned to respondents, and they had notice of the landing of it. and took part of it away, but before they had removed it all, the

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

master of the ship had overloaded the pier with other goods, and it gave way, and part of the respondent's goods were thrown into the water and damaged; there being an agreement between the shipowners and the respondents by which the former employed a watchman, at respondents' expense, to watch goods that were not removed from the pier, over night; and the shipowners sued the respondents for freight, and the latter set up as a defence the injury to the cargo: *Held*, that with regard to cargoes arriving at this port under ordinary bills of lading from foreign countries, landing them at a proper time, and upon a proper dock, with notice to the owners, is equivalent to a delivery.

[Cited in Irzo v. Perkins, 10 Fed. 780.]

2. After such landing and notice, the owner takes all the risks arising from every cause, except that which proceeds from the ship herself.

3. The notice to the respondents was not a notice against the wrongful act of the ship in overloading the pier, or against a defective pier.

4. The master of the ship was clearly liable for the damage to the cargo, for it was by his act, in overloading the pier, that the goods were injured.

[Cited in The City of Lincoln, 25 Fed. 838.]

5. That act of his was not malicious or intentional, but was committed in the ordinary discharge of his duties as master, and within the scope of his powers as the agent of the owners, and that the ship was liable therefor.

6. Whether the master had reason to suppose that the pier was not safe or not, was not material.

7. The damages to the cargo could be recouped in this suit for freight. But the respondents could not have an affirmative decree in their favor, if that damage exceeded the freight.

[Cited in Ebert v. The Reuben Doud, 3 Fed. 521; The Ciampa Emilia, 39 Fed. 127.]

8. The injury to the cargo, and the expense incurred in recovering it from the water, were proper items of such damage.

This was a libel in personam, brought by [James Kennedy and others] the owners of the ship Jeremiah Thompson, to recover the freight money on a considerable quantity of tin plate and iron rods, shipped on board the Thompson at Liverpool, by Phelps, James & Co., and consigned to the respondents [William E. Dodge and others] in New York. The bill of lading was in the ordinary form, and the libel alleged performance of the contract, including the delivery of the goods at this port. The answer admitted that the goods were shipped as stated, and arrived at this port, but averred that they were not delivered in good order; that, on the contrary, the cargo of the ship was discharged in such an unskillful and negligent manner, that the dock on which it was placed broke down, and three hundred and thirteen boxes of the tin plate were precipitated into the river and greatly damaged. The answer also averred that the respondents were at great expense in recovering them, which, with the injury to the plates in being immersed in the water, amounted to more than the freight money sued for. The respondents asked to recoup and set off this damage and expense, to the extent of the libellants' claim for freight, and to recover the balance.

Beebe, Dean & Donohue, for libellants.

Phelps & Fuller, for respondents.

SHIPMAN, District Judge. Before stating and applying the legal principles which must govern this case, it will be proper to state the facts which were developed on the trial. I find the following facts proved: 1. That the ship arrived at this port about the 11th of August, 1866, with a general cargo, including the tin plate and iron rods mentioned in the bill of lading, and also a considerable quantity of pig iron and other freight for other parties. (2) That, on the application of the ship, the harbor-master assigned her a berth at pier No. 45, East river, which she took, and proceeded to unload her cargo, which she continued to do for several days. (3) That the pier was a good one, with sufficient strength to have supported the cargo had it been properly placed thereon. (4) That as the cargo was discharged from time to time, the respondents had notice of the landing of that part of it which belonged to them, and took portions of it from time to time to their warehouses, as was convenient. (5) That before they had removed it all, the ship had so overloaded the bridge of the dock with other cargo, and especially with the iron, that it gave way, and precipitated a portion of the respondents' goods into the river. (6) That the goods were thereby damaged, and the respondents incurred expense in recovering them from the water. (7) That by a standing agreement between the ship, or her owners, and the respondents, when the latter had goods on the dock, landed from ships owned by the libellants, and such goods remained on the dock over night, the master or agent of the ship was to employ a night watchman to watch the goods, at the expense of the respondents, and that they did so in this case.

Now, it is insisted by the libellants that these goods were delivered to the respondents when they were placed on the dock with notice to them, and were consequently at their risk thereafter. With regard to cargoes arriving at this port under ordinary bills of lading from foreign countries, landing them at a proper time and upon a proper dock, with notice to the owners, is equivalent to a delivery. After such landing and notice, the owner takes all the risks arising from every other cause except that which proceeds from the ship itself. The parties to this suit evidently recognized this rule of law, when the watchman was employed at the expense of the respondents to watch this tin during the night time. Had this tin been stolen, or removed by other parties without the intervention of the officers or agents of the ship, or damaged by the elements, the ship could not have been made responsible.

But this does not meet the question before the court. The clear proof is, that the pier was broken down by the weight of the iron placed upon it by direction of the master. He, and not the respondents, selected the dock, and he broke it down. The fact that the respondents did not instantly remove their goods on their being landed, is no answer. The notice to them was not a notice against the wrongful and destructive acts of the ship in discharging the rest of her cargo, nor against a defective pier. The master had no more right to break the dock down and precipitate this tin into the water, than he would have had to pile his iron on crates of crockery and crush them. I attribute to him no intention to injure the pier or the respondents' goods. I am speaking of the legal, and not the moral quality of his acts. He doubtless thought the dock would support the load he was placing upon it, but the result proved that he was mistaken. The consequences of that mistake are not to fall on the owners of the cargo, when they had no agency in causing it.

The only doubt I have felt in the case is in relation to the responsibility of the ship for the damages. The master is clearly liable, for it was by his act that the goods were injured. There was a constructive delivery, and the question has arisen in my mind, whether, after such constructive delivery, the wrongful act of the master in damaging the goods can be visited on the ship. But this wrongful act was not malicious or intentional on his part, but was one committed in the ordinary discharge of his duties as master, and within the scope of his powers as the agent of the owners. For this I think the ship is liable.

Much stress was, during the hearing, laid on the fact that the master had no notice, nor any reason to suspect that the pier was not perfectly safe, and sufficiently strong to support the load he was placing upon it. There is, however, some evidence that he had doubts on this point. But whether he did or not, is not material here. A ship is bound to deliver her cargo in a proper place —that is, a place proper for the amount that is to be landed, and which it is to support at any one time. Vose v. Allen [Case No. 17,005],[2] Judge Ingersoll's remarks. This dock or place is selected by the ship, and it is for her and not for the owners of the cargo, to see that it is sufficient to support the load that she places upon it, and that the weight of the cargo is properly distributed over the pier, so as to secure its safety.

The only remaining question is, whether the damages of the respondents, arising out of this accident, can be recouped against the claim for freight, and if there is a balance in their favor, whether it can be recovered in this suit.

That the damages suffered by the respondents can be recouped from the freight money, which the libellants would otherwise recover, appears to be settled upon authority. Bearse v. Ropes [Case No. 1,192]; Snow v. Carruth [Id. 13,144]: Thatcher v. McCulloh [Id. 13,-862]; Bradstreet v. Heran [Id. 1,792]; Zerega v. Poppe [Id. 18,213]. By way of recoupment, the respondents can, as the damages arise out of the same transaction, extinguish a portion or all the claim of the libellants.

But they can go no further. The court cannot pronounce in their favor for any sum in which their damages may exceed the amount of the libellants' demand. In Nicholls v. Tremlett [Case No. 10,247], the court says: "The admiralty does not take cognizance of pleas in set-off, no statute having given it that authority, and it has been thought by some that a distinct claim by the respondent, founded upon the violation of the contract by the libellant, is in the nature of a set-off, and so not cognizable by this court. But I am of opinion that where the counterclaim is founded upon the same charter party, the respondent may set it up in his answer, so that the damages that he has sustained may be recouped from the amount which the libellant might recover. But in this case, if the damages sustained by the respondent should exceed the just claim of the libellant, the court can give no decree for the excess, the utmost effect being to diminish or extinguish the claim of the libellant; nor could the respondent afterward maintain a suit for such excess. He can not be permitted to split up his demand and litigate the same question twice. Having once voluntarily submitted his claim for damages to the court, he must be content with such relief as the tribunal may afford him."

I understand this to be a correct statement of the law both in the admiralty and common law courts. Sickles v. Pattison, 14 Wend. 257. And it follows that this court can render no judgment for the respondents to recover any excess beyond the libellants' just claim. Had the respondents filed a cross or independent libel they would have recovered their whole damages. But it is too late now. They must content themselves with the diminution or extinguishment of the libellants' just claim.

Let an order be entered referring the case to a commissioner to take the proofs, and report to this court the amount of freight which would be due to the libellants under the bill of lading, and the amount of damage which the respondents have suffered by the injury to their goods from the cause mentioned in the answer, together with the expense which they incurred in recovering it from the water. On the coming in of the report, a final decree will be entered in conformity with the rules laid down in this opinion.

---

[2] It is reported on appeal in [Case No. 17,006.]