## THE CITY OF LINCOLN.[1]

### Post and others *v.* THE CITY OF LINCOLN.

*(District Court, S. D. New York. December 21, 1885.)*

1. WHARVES—BREAKING DOWN OF WHARF—INJURY TO CARGO—LOCUS OF TORT —ADMIRALTY JURISDICTION—CRITERION—STATEMENT OF CASE—RULE 59.

   A wharf, loaded with steel-blooms, which had been discharged from the steam-ship City of L., gave way beneath the weight, throwing the blooms into the water. On suit brought against the steam-ship and the wharfinger, the latter denied the jurisdiction of the admiralty court, on the ground that the negligence alleged was a tort committed upon the wharf, *i. e.,* upon the land. *Held,* that in cases where the negligence and the injury occur in different places, the criterion is the place where the substance and the consummation of the injury are effected. As in this case the injury was caused wholly by the water into which the blooms were thrown, if the breaking down of the wharf occurred through the wharfinger's negligence, such negligence was a marine tort of which a court of admiralty has jurisdiction.

2. SAME—DEFECTS IN WHARF—LIABILITY.

   The evidence showing that the wharf was decayed and out of repair, and that the wharfinger had wholly failed to keep himself properly informed of its defects, and consequently had failed to make it secure, *held,* that he could not be absolved from the charge of negligence.

3. SAME—SUFFICIENCY OF WHARF—LIABILITY OF SHIP.

   A ship is not necessarily answerable, without regard to her own negligence, for the sufficiency of the pier at which she discharges.

4. LIABILITY OF SHIP—SAFETY OF CARGO—NOTICE TO CONSIGNEE.

   Until a consignee has notice of the discharge of goods, and a reasonable time to remove them, if accepted, the ship, as carrier, remains liable, except as modified by the bill of lading, as insurer of the goods, which she is bound to deliver safely to the consignee, and may thus be answerable for the sufficiency of the wharf.

5. SAME—CONSIGNEE'S NEGLECT TO RECEIVE—REASONABLE CARE.

   If the consignee, after such notice and reasonable time, neglect or refuse to receive the goods, the ship having the goods in her custody, though no longer insurer, is still bound as bailee, to care for their safety, or to store them on account of the owner; but she is bound to reasonable care only, and this duty relates back to the selection of the wharf.

6. SAME—BILL OF LADING—SELECTION OF WHARF—REASONABLE CARE.

   By a stipulation of the bill of lading under which the steel-blooms were brought by the City of L., if the consignee was not ready to receive them, the ship had the right "to deposit them on the dock or wharf, at the consignee's risk of fire, loss, or injury." *Held,* that the risk of the consignee, under the above clause, did not embrace the selection of the wharf by the ship, and that the ship was still liable for reasonable care until the consignee had accepted the goods. As the evidence showed that the consignee had had ample notice and time to remove the goods, and had repeatedly promised but neglected to do so, the ship was liable for reasonable care only; but as the evidence indicated that the ship should have known that the wharf was unfit for a heavy cargo, such as this, the ship's selection of it, and discharge upon it, were not such reasonable care of the goods as to entitle her to exemption from all liability.

7. PREVIOUS SUIT AT LAW—VERDICT—HOW BINDING IN ADMIRALTY.

   The wharfinger had previously sued the steam-ship at law for the injury to the wharf by overloading, and the steam-ship had counter-claimed in that suit for the detention of the vessel, as well as for the loss of these same blooms. The jury rendered a verdict that neither should recover of the other. *Held,* that the verdict of the jury must be interpreted as a finding that both were

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

negligent in causing the fall of the wharf. Though in cases turning upon questions of navigation, the verdict in a common-law court is not binding in a court of admiralty, in other classes of cases a prior determination of the same question of fact in a court of law is binding between the same parties in admiralty, whether pleaded or given in evidence. It is immaterial how the parties are arranged if both have opportunity of cross-examination. There being evidence in this suit to show faults on the part of both the wharfinger and the steam-ship, the finding of the jury in the previous suit should not be disturbed, and libelants should recover half their damage from the wharfinger, and half from the steam-ship.

In Admiralty.

*Evarts, Southmayd & Choate,* for libelants.

*Root & Bartlett,* for respondent, Macy.

*Benedict, Taft & Benedict,* for the City of Lincoln.

BROWN, J. The original libel in this case was filed against the steam-ship City of Lincoln, to recover for the damages done to 2,768 steel-blooms, in March, 1882, in discharging them from the City of Lincoln upon pier 45, East river. Before the blooms were removed, the pier broke down in the center, and they were thrown into the river. Some of the blooms were lost, and others damaged. In the progress of the cause a petition was filed by the claimants, alleging that the wharf broke down through the negligence of the wharfingers; and thereupon the owners of the wharf were brought in as parties defendant, upon the analogy of the new fifty-ninth rule in admiralty. See *The Hudson,* 15 Fed. Rep. 162. Exceptions were thereupon filed by the wharfingers to the jurisdiction of the court, as respects them, on the ground that the negligence alleged, viewed as a tort, was, if proved, a tort committed upon land, and therefore not within the jurisdiction of this court.

1. If, as alleged, the wharf was rotten and insufficient, through negligence of the wharfingers in not keeping it in proper repair for the business for which it was held out to the public, the wharfingers are answerable as for a tort. If such a tort is a marine tort, the court has jurisdiction; otherwise not. This question was recently considered by this court in the somewhat analogous case of *Leonard* v. *Decker,* 22 Fed. Rep. 741, where the jurisdiction of the court was sustained, in part at least, upon the ground that although the cause of the damage—projecting bolts in that case—originated upon the land, the consummation and the substance of the damage were upon the water. In the converse case of *The Maud Webster,* 8 Ben. 547, the result of the prior authorities is thus expressed by BLATCHFORD, J., in respect to negligence originating on the water, where the actual injury was received on the land: "But where, although the origin of the wrong is on the water, the consummation and substance of the injury are on the land, the admiralty has no jurisdiction." In every action for a tort of this kind there must be both negligence and damage; neither alone constitutes a cause of action. If the negligence originates in one place, and the damage is sustained in another, some rule is necessary in order to determine the *locus* of the tort. The

supreme court, in the case of *The Plymouth*, 3 Wall. 26, and in other cases, have adjudged that the criterion is the place "where the substance and consummation of the injury" are effected. So in 1 Hawk. P. C. c. 37, § 17, it was decided that where A., standing on the shore of a harbor, fired a loaded musket at a revenue cutter, which had struck upon a sand-bank in the sea, about 100 yards from the shore, by which firing a person was maliciously killed on board the vessel, it was *piracy;* for the offense was committed where the death happened, and not at the place from whence the cause of death proceeded. See *Adams* v. *People*, 1 N. Y. 173; *People* v. *Griffin*, 2 Barb. 427.

In this case, the wharfingers' negligence was wholly upon the land, or in reference to a structure resting upon, and built into, the ground; but the injury to the libelants' steel-blooms was effected wholly in the water, into which they were thrown through the breaking down of the wharf. The whole "substance and consummation of the injury" were, therefore, in the water. It was the water that did the damage. That was the place of the damage, and consequently the place of the tort, for the purposes of jurisdiction. Had the goods been, for instance, crockery or glassware, which were broken or otherwise injured through the breaking down of the wharf, but without being thrown into the water, the injury in that case would have been consummated upon the land, and no jurisdiction in admiralty would have attached. *Rock Island Bridge*, 6 Wall. 213; *The Mary Stewart*, 10 Fed. Rep. 137; *The Accame*, 20 Fed. Rep. 642. If the blooms, in this case, had not been thrown into the water, the injury in question would not have arisen. But as this injury was caused wholly by the water into which the blooms were thrown, if this arose through the wharfingers' negligence, such negligence was a marine tort, of which this court has jurisdiction.

2. Upon the evidence in the case it is clear that this dock was wholly unsuitable for the use to which it was put, and for the weight of iron put upon the center of it; nor can I doubt that this unfitness arose from the neglect of the owner to keep it in proper repair. The weight of evidence shows that the spiles upon which it rested were worm-eaten, decayed, and rotten, and that their condition was obvious upon any proper inspection. It is evident, moreover, that no proper inspection of the spiles was previously maintained, and that the wharfingers must be held responsible for this neglect.

The wharfingers required the blooms to be piled but two high. Some half a dozen blooms, each weighing about 600 pounds, were by accident dropped upon the others. Elsewhere they were piled but two high. The mere piling of these six blooms, out of 2,768, in a third tier is comparatively insignificant; and considering the further fact that the position of these six was known to the wharfingers and to their agents two days before the wharf fell, and that no request was made to remove them, they must be held immaterial as regards the wharfingers' liability. In fact there was no request by them to

make any change, or different distribution, of any of the blooms as they lay upon the wharf, from the time when the discharge was stopped until the pier fell, nearly 20 hours after. The discharge of blooms was begun on Monday; was stopped on notice at half-past 10 on Wednesday; and the wharf fell at 5 A. M. on Thursday. I am satisfied that there was no previous expectation by any one that the wharf would fall. Mr. Powers, the wharfingers' agent, indeed testified that on Wednesday he thought the dock would break down, and that he observed a settling of a foot in the wharf from Tuesday to Wednesday. But I do not credit either of these statements, not merely because all the other witnesses failed to see any such settling, but also for the reason that although Mr. Powers says that he spoke to Mr. Macy, his employer, about the wharf's being heavily loaded, and though the latter came down to look at the blooms, Mr. Macy estimated the settling at the lowest spot at two inches only, and Mr. Powers did not express to Mr. Macy any apprehension of the wharf's falling; nor did either of them take any step to relieve the dock of the weight upon it, or request the stevedore to do so. In a conversation with Mr. Macy, about noon of Wednesday, after the discharge of blooms was stopped, the stevedore obtained permission to put other cargo upon the crib portion of the pier; and at the same time he offered to do anything that was desired by Mr. Macy in reference to the blooms. He testified that, had he known of any apprehension that the pier would fall, he could have removed all the blooms in two hours. The lighter sent by the libelants arrived late in the afternoon; and had there been supposed to be any urgency to relieve the dock of weight, I cannot doubt that some effort would have been made to have the lighter take some blooms aboard at once, instead of waiting, as was done, until the next morning.

These circumstances satisfy me that there was no apprehension on the part of any one that the wharf would break down; yet upon the following morning it gave way, under the slight impulse of waves from a passing vessel, which caused the steamer along-side the wharf to sway a little to and fro, upon which the pier gave way and fell. Upon all these facts I cannot avoid the conclusion, not only that the wharf had become greatly weakened from decay and want of repair, but also that the wharfinger had wholly failed to keep himself properly informed of its defects, and consequently failed to make it secure; and that he cannot be absolved from the charge of negligence in the suitable care and repair of the pier.

3. The steamer is sought to be charged with the loss, both because she negligently overloaded the pier, and also on the ground that having selected her own wharf, she is responsible for its sufficiency, without regard to any question of negligence on her part; or, in other words, that she is an insurer of the wharf. The cases of *Vose* v. *Allen*, 3 Blatchf. 289, and *Kennedy* v. *Dodge*, 1 Ben. 311, are cited in support of this position. The language of the court in those cases,

supposed to sustain the libelant's contention, must, however, be read with reference to the facts; and in both these cases it was found that the ship was guilty of negligence in overloading the pier. In *Kennedy* v. *Dodge* it was expressly found that "the pier was a good one, with sufficient strength to have supported the cargo had it been properly placed thereon," while in *Vose* v. *Allen* the ship resumed the discharge of cargo three times after it had been forbidden; and she continued to discharge until the pier broke and fell. Whatever expressions may have been used by the court in those cases, the adjudications themselves do not sustain the contention that the ship is to be held answerable for the sufficiency of the pier without regard to her own negligence.

I do not think there is any principle or rule of law exceptionally applicable to the relation of the ship to the wharf at which she discharges. Her obligations are to be determined by the general rules of law applicable to her as a carrier. Except under special stipulations of the bill of lading, or other legal exemptions not applicable to this case, a vessel, as common carrier, is answerable for the proper delivery of the goods to the consignee. In *Vose* v. *Allen, supra,* NELSON, J., says: "The simple question is whether the discharge of iron, under the circumstances stated, was, in judgment of law, a *delivery* to the consignees according to the requirements of the bill of lading." The consignee is entitled to notice of discharge, and to a reasonable time to inspect and remove the goods, or to reject them. Until the lapse of that time, the delivery is not complete, and the ship, as carrier, remains liable as an insurer, not of the wharf, but of the goods which she is bound to deliver safely to the consignee. After notice of discharge given to the consignee, and a reasonable opportunity to him to inspect and to remove or reject the goods, the ship's liability as carrier ceases. But if the consignee refuse or neglect to receive them, the ship's duties are not then ended. Until acceptance by the consignee the ship, having the goods in her custody, is still liable as bailee, and bound to reasonable care for their safe custody, or to store them on account of the owner; but she is bound to reasonable care only. *The Mary Washington,* 1 Abb. (U. S.) 1; *Goold* v. *Chapin,* 20 N. Y. 259, 263; *Kimball* v. *Western R. Corp.,* 6 Gray, 542; *Morris & E. R. Co.* v. *Ayres,* 29 N. J. Law, 393; *Cook* v. *Erie Ry. Co.,* 58 Barb. 312, 324; *Missouri Pac. Ry. Co.* v. *Chicago, etc., Ry. Co.,* 25 Fed. Rep. 317; 2 Redf. R. R. § 175, subds. 6, 18; Story, Bailm. § 545.

In *Vose* v. *Allen* there had been no such reasonable opportunity; for the wharf fell while the ship was discharging. In the present case there had been ample notice and ample opportunity to remove the iron. But there had been no acceptance of the blooms by the consignee.

The bill of lading in this case provided as follows:

"The goods to be taken from along-side by the consignees, at Jersey City, Brooklyn, or New York, immediately the vessel is ready to discharge, or oth-

drwise they will be discharged into lighters or landed by the master, and deposited at the expense of the consignee, and at his risk of fire, loss, or injury on the dock or wharf, or in the warehouse provided for that purpose; or sent to the public store, as the collector for the district shall direct; and when deposited in the warehouse, no expense of storage to be charged to the government, and the keys of the warehouse to be delivered to and kept in charge of the officer of customs, under the direction of the collector; the collector of the port being hereby authorized to grant a general order for discharge immediately after entry of the ship."

This stipulation is in substance the same as one of the stipulations recently considered by this court in the case of *The Egypt*, 25 Fed. Rep. 320, 324, and held valid; subject, nevertheless, to the obligation of the ship to take reasonable care of the goods until notice of discharge to the consignee and reasonable opportunity to remove them. *Gleadell* v. *Thomson*, 56 N. Y. 194, 198. The consignee in this case had reasonable prior notice, as I have said, of the intended discharge of the ship on Monday, and promised to have lighters in readiness to receive the goods. No lighters being sent, on further notice to the consignees, they again, on Tuesday, agreed to send lighters at once. On Wednesday forenoon the discharge was stopped because no lighter had arrived, and there was thought to be weight enough on the wharf. Here were ample notice of discharge, and ample opportunity to remove before the wharf fell on Thursday. Had the libelants sent lighters for the blooms within a reasonable time, or according to their repeated agreements, no loss would have been sustained. *Russell Manuf'g Co.* v. *New Haven S. B. Co.*, 50 N. Y. 121. Even aside from the stipulations of the bill of lading, therefore, the ship, at the time the wharf fell, had ceased to be responsible under the extreme liability of a common carrier, or as an insurer of the goods; but until acceptance she continued to be liable, as bailee, for reasonable care only.

The stipulation of the bill of lading above recited does not, in my judgment, diminish the obligation of the ship as regards the sufficiency of the wharf at which she discharges. By this stipulation, if the consignee is not ready to take the goods from along-side when the ship is ready to discharge, the ship has the right "to deposit them on the dock or wharf at the consignee's risk of fire, loss, or injury," subject only to reasonable care by the ship, as above stated. But the risk here assumed by the consignees is the risk that arises after the deposit of the goods upon the wharf, and does not embrace the selection of the wharf by the ship; and as no other exception in the bill of lading affected the ship's selection of a wharf, the ship remained practically an insurer of its sufficiency up to the time when her obligations as a common carrier ceased. After the consignees had promised to send lighters for the blooms, and had had reasonable time to remove them, it is clear that they could not justly hold the ship, even aside from the stipulation above stated, to her extreme liability as common carrier, through an indefinite period, by

their own fault in not sending for the goods as agreed. After the lapse of a reasonable time for removal, her liability as insurer would end. When that liability ended, she remained liable, as bailee, for reasonable care only, until the cargo was accepted; and this reasonable care would extend back to and include the original selection of the wharf, precisely as it would embrace any other possible cause of loss or injury.

Reasonable care as respects the selection of a pier, doubtless requires that no known risks should be unnecessarily incurred. The same care is required that a prudent man would exercise as respects the safety of his own property. But this does not require the ship to take upon herself the duties of a wharfinger, or to make an inspection and survey of the internal construction and condition of every pier to which she resorts. In determining whether due care and diligence are exercised in the selection of a particular wharf, many circumstances, doubtless, are to be taken into account. Chief among these are the customs and usages of the trade and of the port, with respect to the particular cargo; the character and amount of cargo to be deposited, and the length of time it is likely to remain; the known reputation of the pier, its obvious condition, and any notice requiring caution brought home to the vessel; the availability of other piers; and in cases of mixed cargo, reasonable regard to the convenience of all the different consignees.

Some circumstances in the present case would go to justify the vessel. This pier had been accustomed to be used, to some extent, for the discharge of cargoes of iron. It was designated by the harbor master; and when the agents of the vessel suggested the pier above, he told them that this wharf was just as good. The directions, as regards the use of the pier, were not to any considerable extent departed from, except possibly as to the distribution of the blooms, about which there is doubt. There was other cargo on account of which it was desirable to go to a pier in New York, and there seem to have been but few piers in New York at that time available. On the other hand, many of the piers in the East river were well known to be in poor repair, and neither adapted nor fit to receive heavy cargo. There is evidence that the ship's agents were notified by a competitor that pier 45 had once broken down and was unsafe. The ship's witnesses say that the pier showed "unevenness" and "hollowness," which were signs of decay and weakness; and before the discharge was commenced, the ship was enjoined to pile the blooms but two high. Several of the wharfingers' witnesses also testify that they were notified to "scatter them well on the pier," though this is denied by the stevedore's men. Upon the North river piers, blooms are usually piled four high; upon the Brooklyn piers, six high. The stevedore in this case expressed surprise at the injunction to pile only two high, as he had never before been thus restricted. These were notices of an emphatic character of the com+

parative weakness of this pier. If they were not such as should have deterred the ship, in ordinary prudence, from making use of this dock at all, they were at least sufficient to require great caution in the use of it. The evidence leaves it in doubt whether the injunction to scatter the blooms well was given before the blooms were actually discharged. The fact that no objection was apparently made to the placing of the blooms as they were placed, though the discharge was under the eye of the wharfingers' agents, is in the ship's favor. But the ship's duty to the cargo is not to be measured simply by the instructions of the wharfinger, after such clear evidence of the comparative weakness of the wharf. The blooms were not scattered, nor well distributed over the wharf. Instead of being placed to any considerable extent upon the two ends of the wharf, which were of crib-work and the most solid, the blooms were chiefly placed close together in the center of the pier, where it was obviously weakest, and where it snapped short off beneath their weight. The wharf was in fact wholly unfit to receive such a cargo. Repeated notices, and the evident solicitude of the wharfingers, that the blooms should be piled but two high, i. e., one-half or one-third only of the weight usually put upon sound wharves, were a practical warning, as I have said, of the most emphatic character of the comparative weakness of this pier. Ordinary prudence, as it seems to me, would eschew the use of such piers altogether, except under some controlling necessity, such as does not appear in this case; or, if they were resorted to at all, would require them to be used chiefly at their strongest, and not at their weakest, parts. The use of piers known to be weak, for heavy cargoes, like iron rails or steel blooms, is in every case hardly better than an experiment; and such experiments do not seem to me consistent with the obligations of ordinary prudence and diligence, in the absence of any controlling necessity. As respects the rights of a cargo-owner to reasonable care for the safety of the cargo in the selection of a pier, and in the use made of it, I should not feel satisfied, therefore, to acquit the ship in this case, even if the same question had not been previously adjudicated upon evidence almost the same.

The question of liability as between these defendants has, however, already been once determined in an action between them at common law. That action was brought in the circuit court by the wharfingers against the owners of this vessel to recover their damages; and the owners of the vessel in their answer counter-claimed against the wharfingers their own damages in the detention of the vessel, as well as for the loss of these same blooms. Upon the trial before the court and jury, the court charged that if both parties were guilty of negligence contributing to the accident, neither could recover of the other; that if the wharf broke down, not by the negligence of either, but by some unknown cause, neither could recover; and, finally, that either, not being negligent, might recover of the

other, if the latter was found negligent; and that the owner of the vessel in that case might recover for demurrage, and also for the loss and injury of the blooms, in all $3,290. · The jury found that neither should recover of the other, and judgment was entered accordingly. The cause of the wharf's falling was not inscrutable; there was no evidence reasonably to justify such a finding. The verdict must therefore be interpreted as a finding that both were negligent in causing the fall of the wharf.

It thus appears that both the parties, who are the respondents in the present case, voluntarily submitted their claims to a court of common law, each claiming their entire damages against the other. The wharfingers, by their complaint, and the owners of the steamer, by the counter-claims in their answer, having thus voluntarily appealed to a common-law forum, and had their day in court upon this question, I think that the determination then made, that there was mutual fault, should be held binding upon them, in any other action where the same question arises as between themselves. In cases turning upon questions of navigation, indeed, the verdict in a common-law court has been held not to be binding in a court of admiralty, on account of the superior means of determining such questions supposed to belong to admiralty tribunals. *The Ann & Mary*, 2 Wm. Rob. 189. But in other classes of cases, I apprehend a prior determination and judgment in a court of common law are binding as between the same parties in admiralty, whether pleaded or given in evidence as respects the same material facts again in litigation. *Goodrich* v. *The City*, 5 Wall. 566; *Taylor* v. *The Royal Saxon*, 1 Wall. Jr. 333; *The Tubal Cain*, 9 Fed. Rep. 834, 838, and note. Undoubtedly the verdict and judgment in the former action between the present respondents is no adjudication or bar, as respects the libelants in this case, who were not parties to that suit. The present action, however, concerns the same subject-matter, and the very question once determined as between these co-defendants now arises again as between themselves. The analogy of the rule in equity would seem to be applicable, which makes a former decree determining the rights of co-defendants binding in a subsequent action between them on the same subject-matter. It is immaterial, it is said, how the parties are arranged, whether upon the same side, or on opposite sides in the cause, so long as their rights are directly in litigation, and each has the opportunity of asserting his claim and his defense, and to cross-examine the witnesses. *Farquharson* v. *Seton*, 5 Russ. 45, 62; Daniell, Ch. Pr. *1010, *1013; *Nevil* v. *Johnson*, 2 Vern. 447.

There is no question in my mind that the breaking down of the wharf was by the fault of one or both of the defendants; and that being established, it would seem to follow that either of the defendants might offer the verdict and judgment in the former action between themselves as evidence that the injury to the blooms arose

from the mutual fault of both, and as a basis of their equal liability, as between themselves, in a court of admiralty, where, in such a case, the damages may be divided. But whether the former verdict be strictly conclusive or not, in a case of doubt upon such a question, I should hesitate to differ from the finding of the jury, where there is so much evidence to show faults on both sides. It follows that the libelants should have judgment against both defendants, with costs, with a decree in the form directed in *The Alabama* and *The Gamecock*, 92 U. S. 695; *The Civilta* and *The Restless*, 103 U. S. 699.