**FURNESS SHIPPING & AGENCY CO. v. BARBER & CO., Inc., et al.**

**BARBER S. S. LINES, Inc., v. FURNESS SHIPPING & AGENCY CO. et al.**

(Circuit Court of Appeals, Second Circuit. March 9, 1925.)

Nos. 207, 208.

**1. Shipping ⬦52—Charterer held not liable for delay of vessel.**

Detention in England during the war of a Dutch vessel bound under charter from New York to Rotterdam, on account of the contraband character of some of the cargo, *held* not chargeable to any fault of the charterer or the shippers which rendered them liable to the owner, but to neglect of the nominal consignee to promptly advise the British government under an agreement between them.

**2. Shipping ⬦50 — Charterer, compelled through duress to pay obligation of owner, held entitled to recover the amount.**

Where the British government in war time permitted a Dutch ship to proceed to Holland only on agreement by the owner to return a part of the cargo for action of the prize court, but through duress the charterer was compelled to pay storage on the goods in Holland and for their return to London, it was *held* entitled to recover the amount from the owner.

**3. Shipping ⬦115—Allowing vessel to proceed on agreement to return part of cargo for action of prize court held seizure of such property.**

Where a neutral ship, bound for a neutral port, was detained by the British government and allowed to proceed only on agreement of the owner to return a part of the cargo for action of the prize court, such action amounted to a seizure of the property.

**4. Payment ⬦87(2) — Payment to prevent threatened abrogation of contract held made under legal duress.**

A threat by a party to a contract with a charterer to abrogate the contract, which would cause it great loss, unless the charterer paid an obligation of the shipowner, for which it was not liable, *held* to constitute legal duress.

**5. Subrogation ⬦22—One compelled to pay the debt of another to save his own property is subrogated to the rights of the creditor.**

One who is compelled to pay the debt of another to protect his own rights and save his own property will be subrogated to the rights of the creditor.

**6. Shipping ⬦113—Master must protect cargo not accepted.**

Where a consignee refuses to receive goods, it is the duty of the master to store and care for them while in storage.

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Furness Shipping & Agency Company against Barber & Co.,

Inc., with Wilson & Co., Inc., and Rohe & Bro., impleaded. Decree for respondents, and libelant appeals. Affirmed.

Also cross-libel by the Barber Steamship Lines, Inc., against the Furness Shipping & Agency Company, Wilson & Co., Inc., and Rohe & Bro. Decree for respondents, and libelant appeals. Reversed, and decree directed against respondents, except Wilson & Co., Inc.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and Robert McLeod Jackson, both of New York City, of counsel), for Barber & Co., Inc., and Barber S. S. Lines, Inc.

Burlingham, Veeder, Masten & Fearey, of New York City (Carl G. Stearns, and Roscoe H. Hupper, both of New York City, of counsel), for Furness Shipping & Agency Co.

Charles R. Hickox and Clement C. Rinehart, both of New York City, for Wilson.

Bigham, Englar & Jones, of New York City (George S. Brengle, of New York City, of counsel), for Rohe & Bro.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. These suits were tried together below and we shall dispose of them in one opinion. Furness Shipping & Agency Company, Barber & Company, Inc., Wilson & Co., Inc., and Rohe & Bro. will be respectively referred to herein as Furness, Barber, Wilson, and Rohe. Furness was a Dutch corporation, and on August 12, 1915, during the late war, chartered to Barber, a New York corporation, at New York, the Dutch vessel Driebergen for a voyage from New York to Rotterdam, Holland. The charter party provided that the charterer (Barber) was to load a complete cargo of lawful merchandise, and "it is understood cargo shipped under this charter is to be consigned to the Netherlands Overseas Trust Company" (hereinafter referred to as N. O. T.). Barber loaded the steamer with general cargo for different shippers, including 4,218 parcels of packing house products from Wilson and 70 from Rohe, all consigned to the N. O. T. She sailed September 14, 1915, and arrived at Deal, England, October 1, 1915. The British inspected the vessel's papers, as was customarily done, to insure that no goods destined for Germany got through. The vessel was detained at Downs until October 23. She was allowed to proceed to Rotterdam only on the promise of Furness that the Wilson and Rohe shipments

would be returned from Rotterdam to London for prize court action.

The N. O. T. was organized as a private corporation under the laws of Holland in January, 1915. Its purpose was to answer the blockade policy of the Allies against Germany, which threatened the commerce of Holland. It was to stabilize Dutch commerce by enabling importation of goods, either absolute or conditional contraband to be consigned to it and delivered on arrival to the importers resident in Holland, if it was satisfied that they were not destined for Germany. The practice of the importer in Holland was to apply to the N. O. T. for permission to consign his goods to it. If the N. O. T. was satisfied the goods were not intended for Germany, such permission was granted. A written contract was then entered into between the importer and the N. O. T., whereby the former covenanted, with security of a bank guaranty, that the goods were for consumption in Holland or for export to approved ports. The N. O. T. then issued to the importer a permit for the consignment of the goods to it. Thereupon the importer would arrange for shipment of the goods, and on arrival in Holland the bill of lading was endorsed to the importer, unless otherwise instructed by the British authorities.

The shipments here in controversy, of Wilson and Rohe, were contraband, and such permits were required. All Dutch ships for Holland ports were required by the British authorities to proceed to British waters for inspection of their papers. The duration of this detention was governed by the information furnished by the N. O. T. to the British government through the British legation at the Hague. There it was determined whether or not the rules and regulations of the N. O. T. had been complied with. If the information furnished by the N. O. T. was satisfactory, then the ship was allowed to proceed to Holland. If not, the British government would either detain the ship and cargo for action of the prize court, or would require that the offending goods be returned to England after discharge at Rotterdam.

The Driebergen on this voyage was allowed to proceed to Rotterdam on condition that the Wilson and Rohe shipments be returned to England, but the ship was detained 23 days at the Downs. At Rotterdam, the British authorities instructed the representative of Barber not to deliver the Wilson and Rohe shipments pending further advices. Barber's agent discharged these shipments on a private wharf and stored them. Before the Driebergen was permitted to proceed to Rot-

terdam, Furness bound itself to the British authorities at Deal to return these two shipments to London.

Furness filed its libel, claiming damages for detention of the steamer for 23 days at the Downs. The theory of this claim is that, while the cargo was consigned to the N. O. T., the charter was breached by Barber, because it "agreed to take all such steps as might be necessary to consign the cargo to the N. O. T. to comply with such rules and regulations as were promulgated or enforced for the proper consignment of the cargo." Noncompliance therewith is claimed to be the failure to obtain permission to import the goods before they were actually so consigned, and that this was a failure of Barber to comply with the N. O. T. rules, and therefore the vessel was detained. Barber's defense is that its only duty in the premises was to require the shippers to accept bills of lading by which the goods were consigned to the N. O. T., and that it had done so, and was therefore not liable. Barber interpleaded Wilson and Rohe, and they have appeared and made answer. Wilson interpleaded the Netherland American Steam Navigation Company, which originally contracted to carry the shipment, but, upon finding that it had not space to do so, the shipment was turned over to Barber. Before the trial, the petition was discontinued as against the Netherland American Steam Navigation Company.

Instructions were given on November 3 to Barber's agent to forward the Rohe shipment, and on November 8 to forward the Wilson shipment. This was done on January 29, 1916. The expense of storing the goods and forwarding them to London is claimed to be $7,680.35, and is the subject of the libel of Barber (No. 208). There was a delay in forwarding these shipments to London, because the Barber agent demurred, alleging the obligation to do so was that of Furness. However, the N. O. T. threatened to cancel the contract existing between the N. O. T. and Barber since 1915, and to fine Barber 100,000 guilders, if it did not carry the shipments to London. The cancellation of this contract would have been of serious consequence to Barber in carrying goods to Holland. It is Barber's contention, on its libel, that under duress it fulfilled the obligations of Furness, and is therefore subrogated, in equity, to the rights of the British government against Furness, and therefore entitled to reimbursement from Furness. It contends that it is also entitled to recover against the exporters, Wilson and Rohe, be-

cause they failed to comply with the rules of the N. O. T. in not securing permits or licenses before the shipments were made. The contention is that, since the goods were seized by the British government in the manner described, it was necessary for the carrier, Barber, to exercise reasonable care in protecting the goods by storage.

[1] We think the action of the District Court in dismissing the libel in No. 207 should be sustained. The goods shipped on the Driebergen were actually carried on bills of lading made out to the N. O. T. as consignee, and the question involved in this suit is whether there was an obligation on the part of the exporters and carrier to obtain the necessary permits required by the British. There is testimony that Barber's representative knew that there were rules which affected consignees, but not shippers, but he disclaimed knowledge as to what the rules were. Permits could be obtained by importers into Holland and under the rules of the N. O. T. they could not be procured or issued by exporters in the United States. The permits which were secured were secured by representatives of the shippers or consignees who were in Holland. The requirement was that a permit should be obtained in Holland by Dutch importers prior to the arrival of the goods in British waters, and there was nothing in the bills of lading or in the manifest, freight list, or other papers of the Driebergen to show what shipments were or were not covered by the permits. These shipments seem to have been sent forward by Barber in its customary manner; that is, as it had done previously on other steamers. Apparently it was intended that the goods be consigned to the N. O. T., as required by its rules, with notation made upon the bill of lading.

Wilson obtained permits from the N. O. T. in Holland. It appears from a letter written while the vessel was at sea, and before it was learned that she was detained, that Barber deemed it sufficient to merely consign the goods to the N. O. T. in Holland, without having the permits on this side. Nor is there any direct evidence indicating that the owners, Furness, or their representatives in London, considered the clause requiring goods to be consigned to the N. O. T. to mean, at the time the charter party was made, other than the construction placed upon it by Barber. The former Secretary of the N. O. T. testified that permits had to be obtained before the shipment of the merchandise or before the detention of the ship in British waters for inspection of the documents, but

said he did not know which of the two rules was in force at the period of this shipment. The forms prepared by the N. O. T. in connection with the application for licenses would indicate that there was no requirement to have the licenses issued before the shipment of the goods, but it was necessary to have them issued before the examination by the British. In this state of doubt, Furness has not offered any proof, which we deem readily obtainable, if such were the fact, that it was necessary to have the permits issued prior to the sailing from an American port.

It appears that there was an agreement existing between the British government and the N. O. T. whereby the British government was bound not to detain Dutch ships, bound for Dutch ports, because they believed they carried contraband of war or merchandise owned by or destined for the enemy of the Allies, if the merchandise which was to be discharged in Dutch ports was consigned to the N. O. T. Such an agreement became operative in July, 1915. The British considered the consignment of merchandise to the N. O. T. a sufficient guaranty that this merchandise was destined for consumption or use in Holland. The importer had only to apply to the N. O. T. in order to acquire permission to consign certain merchandise to it, which permission was given in writing, and this document constituted the permit in question. Inasmuch as the duty to obtain these consents of the N. O. T. was laid upon the importer, not upon the shipper or consignee, we think that the failure, if any, to obtain them in time was not the cause of the detention of the ship. The reason for the detention of the ship may more properly be placed upon the ground that there was a delay of the N. O. T. in getting together and transmitting its information in reference to the Driebergen's cargo, as required by the British government. The former secretary testified that in his opinion the cause of the detention was not the nonfulfillment of the N. O. T.'s formalities with respect to the merchandise in question, but this resulted in the necessity for returning the shipments in question to England, and the evidence supports this opinion.

It is sufficiently established that the delay was not caused by the mere failure to have permits, but was due to the delay of the N. O. T. in failing to send forward the necessary information in time. We are convinced there was no fault on the part of Barber.

Nor can liability be imposed upon Wilson, for the reason that Wilson did have its permits, and the delay in the use of them was not due to Wilson's neglect. Nor do we think that Rohe, who did not have permits for its 70 packages, can be charged with having detained the ship during this time, so as to impose liability upon it. If information and necessary documents had, with reasonable dispatch, been forwarded to the British, we may fairly assume that there would have been little delay in sending the ship forward under some arrangement like that eventually made, by which packages for which permits had not been obtained would have been returned to London. The court below committed no error in dismissing this libel, and the decree is affirmed.

[2] In No. 208, the libel is sought to be sustained upon the theory that, because of a claim made by the N. O. T. against Barber, enforced by threats, to end its contractual relations, and which resulted in payment of the storage and freight costs by Barber, there is legal obligation on Furness to reimburse Barber. This liability was denied below. It was further held that the contracts of carriage of Wilson and Rohe, as evidenced by the bill of lading, were with Furness as owner of the Driebergen and not with Barber, and that the admiralty court did not have jurisdiction to enforce this claim of Barber.

The libel alleges, and the proof establishes, that after the detention of the Driebergen in the Downs the British authorities only permitted the steamer to proceed on her voyage to Rotterdam upon the express agreement, between the British authorities and Furness, that the questionable cargo should be returned to London, to be brought before the prize court for decision as to whether or not they were destined for Germany. Indeed, this allegation of the libel is admitted by Furness. The agreement of Furness to ship the goods back from Rotterdam to London was a maritime contract. It was a contract of transportation of goods by water, and that has long been recognized as cognizable in admiralty. At Rotterdam, Barber, through its representative, made demand on Furness for payment of the expense in connection with the goods in Rotterdam and their transshipment to London, and this was declined. The N. O. T. threatened that, unless Barber's representative returned the goods to London, they would impose a fine of 100,000 guilders on Barber and cancel its contract, which was made with Barber on October 11, 1915, and cause it irreparable injury. It thereupon paid the expenditures in connection with the storage and safe-keeping of the merchandise in Rotterdam before its transshipment. It also appears that Barber's representative

tried to send the goods to London C. O. D., but the prize court authorities there refused to permit that to be done. It does appear that Barber did not make the payment on account of or at the request of Furness, but did so in the protection of the property.

[3] These charges were incurred primarily because the British government had seized the goods and insisted on their being sent to London. This action by the British amounted to a seizure. The Hellig Olav, 282 F. 534. It was the execution of the then unlimited imperial British power. Such powerful force was brought to bear on the situation when the agreement was made between the master of the Driebergen and the government authorities at Deal, whereby the vessel's owners obligated themselves to return the goods to London, and again by the actual British authority over the N. O. T. It was necessary for the N. O. T. to comply in order to secure noninterference with its commerce. The N. O. T. declined to compel Furness to bear this expense, and took the position that Barber was primarily required to have the goods returned to London, claiming that it was so obligated under the contract of October 11.

[4] But it is clear that it was the duty of Furness, under its agreement with the British, to defray the expense and freight costs of transshipment to London. An examination of the contract between Barber and the N. O. T. fails to disclose any stipulations which would justify compelling Barber to obtain licenses before accepting the goods of New York consigned to the N. O. T. It authorized Barber to send ships to Holland, and provided "that shipowners shall not accept for shipment to any ports of the Netherlands any contraband traffic than that addressed to the N. O. T. and subject to the conditions named herein." There is no breach of contract on the part of Barber in connection with this cargo, and we hold that by reason of its terms there was no obligation of Barber to return the goods to the British prize court. The acts of the N. O. T., threatening irreparable loss to Barber and insisting on the transshipment by it, amounted to legal duress. Radich v. Hutchins, 95 U. S. 210, 24 L. Ed. 409; Lonergan v. Buford, 148 U. S. 581, 13 S. Ct. 684, 37 L. Ed. 569; Union Pacific R. R. Co. v. Public Service Commission, 248 U. S. 67, 39 S. Ct. 24, 63 L. Ed. 131; U. S. v. Holland-America Line (D. C.) 205 F. 943, 212 F. 116.

In the Radich Case, supra, it was said: "To constitute the coercion or duress which will be regarded as sufficient to make a pay-ment involuntary * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment."

In the Lonergan Case, exposure to great loss if payment had not been made was held to be duress when payment was made. In the Union Pacific Case, it was held to be duress where a railroad company sought to issue bonds and had applied to the Public Service Commission for permission, and the commission charged an unwarranted sum for the privilege, and the railroad company paid under protest. It was permitted to recover on the theory that payment was made under duress. So expenses paid to a hospital for aliens who sought admission into this country, and which were met by unwarranted threats of the immigration officers to detain the passengers on the vessel until their recovery, was held to be duress. There—the Holland American Line Case—this court said:

"It seems to us that the rule adopted by the immigration authorities was not consistent with law [or procedure] * * * because it compelled the companies to pay in order to escape the alternative of having their steamers turned into hospitals and houses of detention. Such payments were not voluntary. They could not in the nature of things have been resisted."

[5] Barber was confronted with the alternative of paying the expenses in question or actually having its right to send steamers to Holland abrogated and to be fined 100,000 guilders. The N. O. T. was in fact, although a private corporation, an arm of the government, and it is apparent that it might effectively exercise this threatened force. Since the payment was made under such duress, we think that Barber was subrogated in the rights of the British against Furness in connection with the care and transshipment of the goods to London. Where one performs the obligation of another, or has been compelled to pay a debt of a third person, in order to protect his own rights and save his own property, and generally where it is equitable that a person not a mere stranger or intermeddler furnishes money to pay a debt, he is substituted for or in place of the creditor. A person who has paid a debt under a colorable obligation to do so, that he may protect his own claim, or under an honest belief that he is bound, will be subrogated to the rights of the creditor. But the payer

must have acted under compulsion to save himself from loss. A subrogee is entitled to the benefits of all the remedies of a creditor. Cobb v. Crittenden, 161 F. 510, 88 C. C. A. 452; In re Bruce (D. C.) 158 F. 123; Natl. Surety Co. v. State Savings Bank, 156 F. 21, 84 C. C. A. 187, 14 L. R. A. (N. S.) 155, 13 Ann. Cas. 421. The libel alleges and the facts support Barber in its claim for right of subrogation. A libelant in admiralty may avail himself of subrogation. The Jersey City (D. C.) 43 F. 166; The New York (D. C.) 93 F. 495; 1 Corpus Juris, Admiralty, pp. 1277, 1298. Barber having performed the Furness maritime contract under coercion, it is entitled to reimbursement in an admiralty suit by right of subrogation.

Nor may Wilson be held either primarily or secondarily liable for this expense, and this for the reason that Wilson's shipment was fully covered by permits. The Rohe shipment was not covered by a permit. It was the obligation of its representative in Holland to have on hand the permit, and the failure of this shipper to produce licenses to the British authorities caused its packages to be returned from Holland to the prize court in England. It is clear that the packages would not have been suspected or ordered sent to the prize court, if it had a permit covering the rejected packages. It is also clear, from the evidence and correspondence, that Rohe knew of the requirement that permits be submitted to the British. Therefore Rohe was responsible for the expenses in connection with their packages, and they are liable accordingly.

[6] The expense of the storage at Rotterdam and the freight back on the transshipment to London were necessarily incurred in the protection of the merchandise, and this was done for the benefit of those responsible for the care of the goods during this period. The master of the vessel is, in the performance of his duty, required to exercise reasonable care for the safe-keeping of the goods intrusted to him. It did not cease when the goods left his vessel. If it was necessary to store them, as the evidence indicates, it was likewise necessary to care for them while in storage. The exercise of this reasonable care, devolving upon the master, required such steps as the demands of safe-keeping required. It has been held that, where a consignee refuses to receive a cargo, such a duty is imposed upon the master. The Captain John (D. C.) 33 F. 927; The Surrey (D. C.) 26 F. 791; City of Lincoln, (D. C.) 25 F. 835; The Argosrl, 5 P. C. 155.

When these goods were discharged and in the custody of Barber's representative at Rotterdam, that custodian held them subject to the right of the British government thereto. Payments of storage made by Barber seem to be reasonable. That was justified under the circumstances. The cost of transshipment and storage of the rejected packages was for the benefit of Rohe in as far as its 70 packages are concerned, and liability under the circumstances must be imposed upon them for such packages.

We conclude that the court below erred in dismissing this libel, and the order is reversed, with directions to the District Court to enter a decree in favor of Barber against Furness for such expenditures and freight as were incurred in relation to the Wilson shipment, and against Rohe primarily for its cargo, with Furness secondarily liable.

Decree in No. 207 affirmed, and reversed in No. 208.