## THE INDIA.

*(District Court, S. D. New York.  November 4, 1882.)*

1. VESSEL—CHARTER-PARTY—LIEN FOR SUPPLIES OF COAL.

   By the terms of a charter-party the charterer was to provide and pay for all the coal required.  The master and crew were to be appointed and paid by the owners, but the master was to be "under the orders and directions" of the charterers "as regards employments, agency, and other arrangements." *Held,* that a lien attached to the vessel for coal supplied at a foreign port on the order of the consignees of the ship appointed by the charterer.

2. SAME—CHARTERER AS SPECIAL OWNER.

   Where the charterers of a vessel were by the charter constituted owners of the ship *pro hac vice,* the vessel in their possession and not in possession of the general owner, the master subject to their directions, the vessel is bound for coals furnished upon her credit in a foreign port upon the order of the agent of the special owner.

3. FOREIGN SHIP—LIEN FOR SUPPLIES.

   It is not essential to the creation of a lien upon a foreign ship for supplies that the supplies be ordered by the general owner or his agent.  When the general owner of a ship intrusts her entire possession and control to another as her special owner, and when such necessaries are so supplied upon the credit of the ship, the ship is bound, although no personal liability is incurred by the general owner.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelants.

*Ullo & Davison,* for claimants.

BENEDICT, D. J.    This is an action to enforce a lien upon the German steamship India, for the price of a quantity of coal delivered on board that vessel at Philadelphia in June last.   The undisputed facts are as follows:

The steamer India is a foreign vessel owned in Hamburg.   In June, 1882, being then in the port of New York, she was chartered by the firm of Huser, Watson & Co., of New York, for "all lawful service and employment between

United States and Brazil, one round voyage, with liberty to call at intermediate ports for cargo." By the terms of the charter Huser, Watson & Co. were to provide and pay for all the coals required. The master and crew were to be appointed and paid by the owners, but the master was to be "under the orders and directions of Huser, Watson & Co." "as regards employment, agency, and other arrangements," and Huser, Watson & Co. agreed to indemnify the owners for all consequences or liabilities that might arise from the captain signing bills of lading or complying with their orders. All derelicts, towage, and salvage were to be for the owners' and charterers' equal benefit. By virtue of this charter the possession and control of the steamer passed to Huser, Watson & Co., of New York, and, as the answer expressly states, the steamer was in the possession of Huser, Watson & Co. at the time of the purchase of the coals in question. At Philadelphia the consignees of the steamer were S. Morris Waln & Co. This, I understand S. Morris Waln to mean when he told the libelant that the steamer was coming to his firm. The coals in question were ordered for the use of the steamer on her then intended voyage by S. Morris Waln & Co. They were delivered on board the vessel by the libelants, and were there received by the master of the steamer. After their delivery a bill made out against the steamer and owners was presented by the libelants to S. Morris Waln & Co., but was not paid because of the libelant's refusal to make a deduction claimed by S. Morris Waln & Co., by reason of a detention of the steamer alleged to have been caused by the libelant's failure to deliver the coals in proper time.

On the return of the steamer to New York she was libeled in this action, and the question now to be determined is whether the libelants acquired a lien upon the steamer for the coals so delivered by them.

Upon the testimony there is no difficulty in finding that the coals were supplied upon the credit of the steamer, and not upon the personal credit of S. Morris Waln & Co. There is testimony from Jacob S. Waln tending to show that the credit of his firm was relied on, but this testimony is flatly contradicted by Berwind, the other party thereto, and moreover is not inconsistent with a reliance upon the vessel's credit. A material man may, and generally does, rely upon a personal credit as well as the credit of the vessel. The question here is whether the coals were furnished upon personal credit alone. The testimony forbids such a conclusion.

It is, however, claimed that the coals were not ordered by the master of the steamer, nor by the owner of the steamer, nor by any authorized agent of the owner, and therefore it is insisted that no lien attached to the vessel. But the master of the vessel assumed charge of the receipt of the coals, and he hastened the delivery and assumed to direct the same, while the order for the coal was given by the consignee of the steamer. The consignment of the steamer to S. Morris

Waln & Co., in the absence of notice to the contrary, conferred upon S. Morris Waln & Co. apparent authority to act for the owner of the steamer in such a matter as ordering necessary coals. I say in the absence of notice, because, while the testimony of Jacob S. Waln is to the effect that he informed the libelants that he was acting for a charterer, and not for the general owner of the steamer, this testimony is also contradicted by the witness Berwind, and Berwind is to some extent corroborated by the undisputed fact that a bill for the coal was, at the time, made out against the steamer and owners, and the same received by S. Morris Waln & Co. without objection made to its form. In this state of the evidence, therefore, it cannot be held that notice of the existence of the charter was given to the libelants, and they chargeable with knowledge that S. Morris Waln & Co. were not acting in behalf of the general owners of the steamer. The case in this aspect is the ordinary one of supplies for a foreign vessel ordered by the agents of the general owner and delivered to the master upon the credit of the vessel and her owners; and by the maritime law a lien is created upon the vessel for supplies so furnished.

But the liability of the vessel is also clear, if the testimony of Mr. Waln be considered as the true account of the transaction between his firm and the libelants respecting this coal, and the libelants held chargeable with knowledge of the terms of the charter, and that Morris Waln & Co. were acting as agents of Huser, Watson & Co., and not as agents of the general owner of the steamer. For Huser, Watson & Co., of New York, were, by the charter, constituted owners of the ship *pro hac vice*. The steamer was in their possession, and not in the possession of the general owner. So the answer states. The master was subject to their direction, and not to the direction of the general owner. In any aspect of the testimony, therefore, the libelants were dealing with a vessel foreign to the port of Philadelphia, and the vessel became bound for the coals furnished upon her credit in such foreign port upon the order of the agent of the special owner.

It is not essential to the creation of a lien for supplies furnished a foreign ship that the supplies be ordered by the general owner or his agent. When the general owner of a ship intrusts her entire possession and control to another as her special owner, he thereby assents to the creation of liens upon the ship for necessaries supplied by order of the special owner, and when such necessaries are so supplied upon the credit of the ship, the ship is bound, although no personal liability is incurred by the general owner.

My conclusion, therefore, is that the libelants acquired a lien upon this steamer for the value of the coals in the libel mentioned. This conclusion is not in conflict with the decisions in the cases cited in behalf of the claimant, (*The Norman,* 6 FED. REP. 406; *The Secret,* 3 FED. REP. 665; and *The Lulu,* 10 Wall. 203,) and is in harmony with the principles of the cases of *The Schooner Freeman,* 18 How. 182; *The City of New York,* 3 Blatchf. 187.

Let a decree be entered in favor of the libelants for the sum of $1,398.40, with interest from June 19, 1882, and the costs of this action.