. Young and others *v.* Lehmann and others.

*(District Court, S. D. New York.* April 30, 1886.)

1. Carrier of Goods by Ship—Delivery of Iron Cargo—Wharf Breaking Down—Weighing—Charter-Party.

Though a ship as a common carrier where she selects her own wharf is answerable for its sufficiency until the lapse of a reasonable time for removal of the goods by the consignee, including the necessary custom-house weighing and gauging, the ship is not responsible for the breaking down of a wharf apparently sound and in good condition, selected by the consignee in accordance with the provisions of the charter, when the breaking down occurs through secret defects, of which the ship has no notice, and the evidence does not establish any unusual or excessive deposit of cargo for a sound wharf.

2. Same—Case Stated—Ship's Agents, when Agents of Charterers.

The ship S., under a charter to the respondents, was loaded with spiegel iron "to be delivered at New York, at such wharf or place as may be ordered by the consignee on arrival." The consignees finding it difficult to obtain a wharf for spiegel iron, requested the local ships' agents to find a wharf, which they did. The ship began to discharge there, dumping the iron in a pile, from which it was distributed as fast as it could be weighed. A part of the wharf, 30 feet by 20, where the pile was, gave way, and a portion of the iron not distributed slid into the river. The timbers and supports of the wharf proved to be decayed and rotten. *Held,* that the charter imposed upon the consignee the duty of finding a suitable wharf for the discharge, that the ship's agents in selecting the wharf in question upon the consignee's request acted as the agents of the respondents, and that the selection made was legally the charterers' selection, and not the ship's; and the evidence not showing either notice of unsoundness to the ship or an excessive or unusual accumulation of iron, *held,* that the ship was not answerable for the loss.

In Admiralty.

*E. B. Convers,* for libelants.

*Jas. K. Hill, Wing & Shoudy,* and *H. Putnam,* for respondents.

Brown, J. On the fourth of June, 1880, about 1:30 p. m., while the libelants' ship Stranton was discharging a cargo of spiegel iron

upon the dock at the foot of Noble street, Williamsburgh, a portion of the pier, about 30 feet long by 20 feet in width gave way, and 93 tons of spiegel iron slid into the water. Seventy tons were recovered; the other 23 were lost. The respondents, claiming that the loss was through the fault of the ship, retained from the freight the sum of $1,145.31, to recover which this libel was filed.

The right to recover depends upon the question whether the ship was in fault by reason of her negligence; or, if not negligent, whether she was liable for the loss as a common carrier. The ship was chartered to the respondents to bring a cargo from England to New York, "the freight to be paid at the rate of 14 shillings per ton upon the right delivery of the cargo * * *" at "such wharf or place as may be ordered by the consignee on arrival." Neither the charter-party nor the bill of lading contained any other provisions material to the case.

The provision in the charter that the iron should be delivered "at such wharf or place as may be ordered by the consignee on arrival" was not a mere privilege of the consignee; it also imposed a duty upon him to provide a suitable wharf. It is well known that many wharfs in this port are unfit to receive a heavy cargo like iron, and there is often more or less difficulty in obtaining a suitable place for discharge. This clause of the charter I must regard, therefore, as intended in part to relieve the ship from the burden of finding a suitable wharf, and to impose that duty upon the consignee. Before the arrival of the vessel the respondents found there was likely to be difficulty in obtaining a suitable berth for such a cargo, and they therefore requested the ship's agents in this port, who were better informed in regard to such matters, to select a wharf. They accordingly selected the wharf in question. The ship went there, and gave timely notice to the respondents of her readiness to discharge. The wharf was one at which iron had been accustomed to be discharged; and in external appearance it was sound, even, and suitable for the purpose, though more newly repaired at the outer end. The evidence showed that at the place where it gave way the main rafter and some uprights were decayed and rotten. The planks were not broken, but when the rafter gave way the iron upon this portion of the wharf slid off into the river. The outer end of the wharf, about 30 feet in length, was of solid crib wood. Inside of that the planking of the wharf was laid upon rafters supported by piles,—the usual and necessary mode of constructing wharves in the East river.

The discharge of cargo commenced at 7 o'clock on the morning of the 14th from hatches 3 and 2, which were respectively about 60 and 150 feet from the end of the pier. The United States weigher was present to weigh the iron as it came upon the dock at 7 o'clock, or a little after. Up to the time the wharf gave way about 150 tons had been landed. As fast as it was weighed the iron was distributed on various parts of the dock, from the extreme end of the pier along a

space of 250 feet towards the shore. None of the iron that had been weighed and distributed went into the river. As discharged from the cubs by which it was raised from the vessel the iron was dumped along-side, forming a conical pile, from which it was taken to be weighed and distributed. It was at this point that the wharf gave way. It was only what was in the pile waiting to be weighed and distributed that went into the river.

By a statute of the United States (Rev. St. § 2882) it is unlawful to remove such goods from the pier until they are weighed by the proper officer. The duty of the ship to make a "right delivery" includes a delivery at a place where the goods can be weighed; and her liability as carrier continues until a reasonable time has elapsed for that purpose, and for the subsequent removal of the goods by the consignee. If not suitable for that purpose and for that period, the wharf is not a suitable place of delivery. *Tielman* v. *Plock*, 17 Fed. Rep. 268, affirmed 21 Fed. Rep. 349. Except for some stipulation in the charter-party or bill of lading, the liability of the ship as a common carrier, and as insurer of the goods, for the sufficiency of the wharf selected by her, must continue during that interval. That time had not elapsed in this case when the wharf fell; and, accordingly, if the responsibility for the selection of the wharf had rested upon the ship, she must have been held answerable for this loss without regard to any question of negligence, or of overloading the part of the pier that fell. See *Vose* v. *Allen*, 3 Blatchf. 289; *The City of Lincoln*, 25 Fed. Rep. 835, 839; *McAndrew* v. *Whitlock*, 52 N. Y. 40.

The ship was not in this case responsible, however, for the dock selected, nor was the selection made by her. The ship's agents, in acting upon the request of the respondents to select a dock, acted in behalf of the respondents in the discharge of the duty devolving upon the latter under the terms of the charter. For that purpose the agents were the respondents' agents, and the selection of the Noble street dock was, in law, the respondents' selection. The agents did not represent the ship in that selection, and had no authority to vary the terms of the charter. The vessel, therefore, was not an insurer of the sufficiency of the wharf for any period whatever, nor responsible for its secret defects, or for any loss arising from the use of it, unless that loss arose from some unreasonable or improper use of the wharf, such as overloading or an improper distribution of cargo; in other words, for her own negligence.

The wharf having been selected in effect by the respondents, and being a wharf also where cargoes of iron were accustomed to be landed, and being in external appearance sound and fit for such a cargo, the master of the ship, and the stevedore employed by him, having no notice of any secret defects, had the right to assume that it was a sound wharf, and a suitable place for the landing of the cargo in the customary manner. They were in no fault so long as they discharged the iron in the usual way, and, having no notice of any

v.27F.no.4—25

defects, avoided any unusual piling that could be deemed excessive for a wharf presumptively sound. Judged by this rule, no negligence in the use of the wharf can be imputed to them. The testimony of the witnesses on the part of the ship, given before the amount of iron taken from the water was known, must, no doubt, be greatly modified. Their estimates of the weight of iron on that part of the pier which gave way turns out to be only from one-half to one-third of what it actually was. There is no question, however, but that the iron was well distributed as fast as it was weighed, and that the weigher was in attendance all the time. As the iron was discharged faster than it was weighed, there was a gradual accumulation of iron near the scales. But the evidence does not show that the accumulation was excessive or unusual. The respondents' evidence shows that the amount was 93 tons upon a space about 20 feet by 30. The carpenter estimated that the strength of the timbers that supported this part of the wharf, if sound, would be 200 tons. There is no evidence to contradict this estimate. Aside, however, from this evidence, the custom-house weigher called by the respondents must be regarded as a disinterested witness. He testified that he had seen five times as much iron upon that wharf, and, near the conclusion of his testimony, he says: "I do not think this wharf was loaded unusually. If sound, it would not have broken. The pile was not unusual in height or extent. This dock had a good character. It was a city wharf, and thought to be a good one." Upon this evidence I am not warranted in holding that the ship was in any fault in her use of the wharf, or that the pile at the scales was unusual or excessive for a sound wharf, or that the master of the ship had any reason to suppose the wharf was weak, or not able to sustain the weight that a sound wharf would have borne without injury.

The libelant is entitled to a decree for the amount claimed, with interest and costs.