### THE CENTURION.

### BREGARO v. THE CENTURION.

### AMERICAN SUGAR REFINING CO. v. SAME.

(Circuit Court of Appeals, Second Circuit. May 28, 1895.)

1. SHIPPING—DAMAGE TO CARGO—STOWAGE OF MOLASSES.

The between decks, when perfectly tight and strong, is not an improper place for the stowage of liquids, such as molasses.

2. SAME.

A steamship bound from West India ports to New York had sugar stowed in her hold, with hogsheads of molasses in the between decks above it. The between decks were of steel, and perfectly tight and strong, and the cargo was stowed by an experienced stevedore under the supervision of the supercargo. On the voyage severe squalls were encountered, heaving the ship temporarily at an angle of 45 deg., washing the deck cargo adrift, and giving her a list to starboard of over three feet. Some of the casks of molasses were broken, and their contents ran down the scupper pipes into the bilges of the hold beneath, and the bilges and sluiceways became choked with molasses, so that it flowed over the bottom of the hold, and caused the sugar in the hogsheads to be dissolved. *Held*, upon the evidence, that the cargo was properly stowed; that the peril encountered by the ship was sufficient to create damage to a properly stowed cargo; and that the ship and her owners were exempt from liability under an exception in the bill of lading of damage arising from perils of the sea. 57 Fed. 412, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

These were libels by Jose Bregaro and by the American Sugar Refining Company against the steamship Centurion, John Blumer & Co. claimants, to recover for damage to cargo. On petition of the claimants, the New York & Porto Rico Steamship Company, to which the ship was under charter at the time of the damage, was cited in to answer therefor. The district court found that the loss was caused by negligent stowage, and entered a decree against both the ship and the charterers, to be collected in the first instance from the latter, as they were bound by the charter to indemnify the owners. 57 Fed. 412. The charterers and owners appeal.

J. Parker Kirlin, for the Centurion, appellant.

Geo. A. Black, for the New York & Porto Rico Steamship Company, appellant.

Wm. W. MacFarland, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. Jose Bregaro shipped on board the steamship Centurion, at Ponce, Porto Rico, 250 casks of molasses, and his agent shipped on the same steamer, at Arroyo, 465 hogsheads of sugar, for transportation to New York. The bills of lading excepted the ship and its owners from liability for damage arising from perils of the sea. When the cargo was discharged in New York,

on March 3, 1893, 88 casks of molasses were broken and empty, and others were partially empty from leakage. The sugar in the lower tiers of the hogsheads was partially dissolved by its mixture with the molasses which accumulated at the bottom of the hold. Bregaro brought a libel in rem against the Centurion for the damage to the molasses, alleging that it was caused by the negligent and improper manner in which the merchandise was stowed. Bregaro and the American Sugar Refining Company also libeled the steamship to recover damages for the injury to the sugar, alleging improper stowage, and that, through the defective condition of the scuppers, bilges, and sluiceways of the ship, and the neglect of the officers to properly pump the vessel, the drainage from the sugar and the molasses collected in the lower hold, and washed out the sugar from the hogsheads. John Blumer & Co., the owners of the Centurion, answered the libels, alleging that the injuries happened through perils of the seas, and denied that there was any defect in the stowage, but, if there was, they alleged that it was the fault of the New York & Porto Rico Steamship Company, the time charterer, which had the management and control of the stowage. The owners also filed petitions praying that the charterer might be cited in to answer the allegations of the petitions, which repeated, in substance, the averments of the answer in regard to the negligence, if any, of the charterer. The steamship company was cited in and appeared and answered the petitions. In regard to the injury to the molasses, it averred that the stowage was under the supervision of the officers of the vessel, was approved by them, was well done, and that the damage happened through perils of the seas. In regard to the injury to the sugar, its answer contained the same averments in regard to stowage, and also averred that the damage was caused by the defects of the steamship's equipment and management, whereby the drainage from the sugar and the molasses accumulated and dissolved the sugar. The causes went to trial under the issues as thus made, and were heard upon depositions.

The Centurion was a steel ship, built in May, 1886, 270 feet long, with a depth of hold 26 feet and 1 inch, having two steel decks, the upper deck and the between decks, which were perfectly tight, except the closely covered feeder holes. Whether these holes were caulked at the time in question need not be determined, as it is manifest that they had nothing to do with any injury to this cargo. She was chartered by the steamship company under a charter of demise, the captain was under its orders and directions, and, as between shipowners and charterer, no claim was to be made against the owners for loss of cargo. A supercargo could be appointed by the charterer who was to see that the voyages were prosecuted with the utmost dispatch. When she started upon this particular voyage, she was clean, in good condition throughout, and was entirely seaworthy. She took a general cargo in New York in January, 1893, for ten Porto Rico ports, and discharged and took in cargo at each port, when required. She reached San Juan on January 31st, and there-

after visited nine other ports, of which Ponce was the third, where she took in the molasses on.or about February 9th, and discharged all her cargo. She received the sugar at Arroyo on February 13th, returned to San Juan on February 18th, and sailed for New York on February 19th. The molasses was stowed in No. 2 "between decks," the sugar was stowed beneath in No. 2 hold, and the stowage was made by an experienced stevedore under the supercargo's supervision and control, and in the places of his selection. In the afternoon of February 22d there was a strong gale, with heavy squalls, and at half past 5 o'clock a heavy sea struck the ship, heaving her temporarily at an angle of 45 deg., washing the deck cargo adrift, and giving the ship a list to starboard of three and one half feet, which she retained during the voyage. The next morning it was discovered that the molasses was adrift in the between decks. The supercargo and the crew went down, found that part of the casks in both tiers were broken, that some of them were empty, and that they were generally out of position. They were shored up and secured as well as practicable. The bad weather continued, and on February 24th the sea swept the deck cargo overboard, broke some rails, and did some other damage. She anchored at Staten Island in the evening of February 26th. On arrival at New York the cargo was unloaded, and the extent of the damage was ascertained. The leaking molasses had run down the scupper pipes into the bilges in hold No. 2 beneath; the bilges and the sluiceways in the bulkheads which separate the bilges became filled and choked with the accumulation of molasses; it flowed over upon the bottom of the hold; mixed with the leakage from the sugar hogsheads; caused more sugar to be dissolved; and soon the limbers were full of a thick mixture of sugar and molasses, which could not flow away. The sluiceways were left open, but were clogged with wet and soft sugar and molasses. It appears that the hogsheads in which Muscorado sugar is packed are intentionally not tight, but have four or five holes, through which the hogsheads may be "purged"; that the staves are loose; and that the drainings settle in the bottom of the hogsheads. Molasses casks are not full when they are put on board, but five or six inches are left for fermentation, and each cask has two small holes, one on each side of the bung, to permit an escape of the fermenting molasses, which flows out through the holes, and makes the casks very slippery and easily movable.

The issue of fact which was before the district court was whether the shifting of the molasses casks which created, first, the damage to the molasses, and, next, the damage to the sugar, as the result of the drainage of the molasses, was caused by the perils of the sea, the defects of the ship, or by negligent and improper stowage. Numerous criticisms were made by·the charterer upon the alleged defects of the ship as to sluiceways, bilges, pumps, and the negligence of the crew in pumping, but we are satisfied that these criticisms were groundless, and may be eliminated from the case. The district judge was of opinion that the shifting of the cargo arose "from the

place and mode of stowage, and that the stowage was not reasonably sufficient to meet ordinary rough weather, such as to be reasonably anticipated and provided for"; and was further of opinion that "the weather was not extraordinary, and that, before any rough weather was encountered, the movement of the casks in No. 2 between decks was observed, which the supercargo sought to check." The conclusion was that the damage was the result of bad stowage, and, inasmuch as between cargo owners and the ship, the latter is liable for pecuniary loss from that cause, the decree in each libel ran against the ship owners; but inasmuch as, between charterer and ship owners, the charterer was liable to the owners, the decrees provided that the charterer should pay the amounts therein named. The ship owners and also the steamship company appealed from each decree, but upon different grounds. Our examination of the record has led us to conclusions of fact which differ from those of the district judge.

In the original depositions which were given by the officers of the Centurion, the good character of the stowage was unanimously supported, and there was no attack or outspoken criticism upon the place of the stowage. It was not until the supercargo had testified that the place was selected by him after making inquiries of the captain and the mates as to the tightness of the between decks that any fault was found with his selection. The officers denied that this conversation took place, and the captain, after testifying that he did not give the supercargo to understand that the between decks were slack or likely to injure molasses, said that after and before the stowage he told the supercargo that, if he (the captain) had been stowing the cargo, he should not have put molasses in the between decks, and gave him to understand that between decks was not the proper way, by which he evidently meant place, to stow cargo. The captain's narrative of this conversation is so vague and general that the utterance of his objections to the place of the stowage, at the time when utterance was important, must have been feeble, and the tardiness with which these conversations were brought into the case shows that they were not deemed of importance in its early preparation. We cannot concur in the full extent of the finding of the district judge that the supercargo insisted upon stowing the molasses in the between decks, contrary to the advice of the officers, for the preferences of the officers could not have been outspoken or positive. Furthermore, the positive testimony on the trial adverse to the suitableness of the place was also feeble. If the between decks are tight, and in this vessel they were both tight and strong, the character of this part of the ship was not condemned by sailors or stevedores as a place for the stowage of liquids. A day or two after the vessel left Ponce, and was on its way to another port, and before the cargo was all taken on board, the molasses casks moved, and were examined and secured. This fact does not seem of especial significance, for there was no more trouble until the heavy storm of February 22d. This storm appears both from the account given at the time, before the extent of damage to the cargo was known, and from

v.68F.no.2—25

the effect upon the vessel itself, to have been sufficiently .severe and violent to create the injury to cargo, although sufficiently chocked and fastened to resist storms which might reasonably be anticipated. If this case had been between the shipowners and charterer alone, and founded upon the liability of the charterer to indemnify the owners against loss to cargo resulting from its negligence, the testimony on the part of the ship would be most convincing against the theory of the charterer's negligence. It must be recollected that the case against the charterer derives no additional strength from the fact that the controversy is tripartite. The burden of proof is still upon the cargo owner or the shipowner to establish the fact that the injury was caused by improper stowage, and this burden has been, in our opinion, imperfectly borne. If the ship owners presented, in reply to the charterer, testimony of importance showing that the injury happened by reason of negligent stowage, their witnesses had been, in their testimony in chief, so unanimous and harmonious in favor of the charterer, and had been so silent in regard to the impropriety of the location of the stowage, as to prevent a finding upon their testimony that there was a defect in either. The case then rests upon the conclusion to which the trier may come as to the extent of the peril. The district court was of opinion that it was insufficient to cause properly stowed cargo to break loose, and therefore the stowage must have been insufficient. We are constrained to the opinion that the stowage was affirmatively proved to have been proper, that the peril was sufficient to create and did create the damage to a properly stowed cargo, and that, therefore, the liability of the ship and her owners was within an exception in the bill of lading. The decrees of the district court are reversed, with costs of this court to be equally divided between the two appellants.