## THE DEL NORTE.

### TOWNSLEY et al. v. CRESCENT CITY TRANSP. CO.

(Circuit Court of Appeals, Ninth Circuit. October 27, 1902.)

#### No. 801.

1. SHIPPING—DEMISE OF VESSEL FOR TERM—LIABILITY OF OWNER FOR WRONG-FUL ACTS OF OFFICERS.

By a charter of a steamship the entire ship was let and delivered to the charterer for the term of four months, under the express and distinct agreement that he should have full charge of her and be entitled to all her earnings; that all of the officers of the vessel, including the master, engineer, and steward, who were to be appointed by the owner, should be "in all respects under the order and direction" of the charterer, and subject to removal on his complaint; that he should redeliver the ship to the owner at the expiration of the term in as good order and condition as she was at the time of the agreement, with certain exceptions of usual wear and tear and damages arising from sea perils and inevitable casualties. It further provided that in case the charterer should fail to pay the rental at the times specified, or the operating expenses, including wages, the owner should have the right to retake possession, and that on his request the master should take and hold possession of the ship as his representative. *Held*, that such charter constituted a demise of the vessel, and that neither the master nor steward could be regarded as agents of the owner during the life of the charter, so as to charge him or the vessel with liability to the charterer on account of their alleged wrongful acts.

Appeal from District Court of the United States for the Northern Division of the District of Washington.

Pratt & Riddle and James Kiefer, for appellants.

Harold Preston, E. M. Carr, and L. C. Gilman, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. In 1898 the appellee, owner of the steamer Del Norte, chartered her to the appellant Townsley for a term commencing on the 6th day of June of that year and ending on the 6th day of October, 1898, under which charter the vessel was delivered to Townsley, who retained possession thereof until about September 3, 1898, when, because of his failure to pay the rent stipulated by the charter to be paid, the owner, the Crescent City Transportation Company, took possession of the vessel. Thereupon Townsley libeled the ship for damages, alleging that he had suffered certain specified losses and damages by reason of the misconduct of the master and steward of the ship and the dishonesty of the master during the time she was under charter to him. The transportation company filed a cross-libel against Townsley for rent alleged to be due it from him under the charter party, which cross-libel was answered by Townsley, denying the claim made for rent, and the claimant of the ship answered the libel, denying the alleged losses and damages to the libelant. The judgment below was against the libelant's claim for damages, and in favor of that of the cross-libelant for rent. 111 Fed. 542.

The case depends upon the question whether the master and stew-

ard of the ship were the agents of its owner or of the charterer, to determine which question resort must be had to the charter-party. There were three written agreements evidencing the contract of the parties, two of which bore date June 6, 1898, and the other June 10, 1898. The second agreement of June 6th only provided for the deposit of the charter in escrow until certain advance payments required thereby had been made, and which it appears were made, and the charter delivered. The law applicable to the case is well settled. If the contract between the parties constituted a demise of the ship, which by virtue of the contract passed to the possession and control of the charterer, the master and steward became his agents, and were not the agents of the owner. On the contrary, if the agreement between the parties constituted a mere contract of affreightment, and the owner still retained possession and control of the ship, then clearly the master and steward were his agents, for whose wrongful acts he is liable. Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; Reed v. U. S., 11 Wall. 591, 20 L. Ed. 220; Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403. Turning to the charter party in question, we find it there declared and provided, in the first article:

"That the said party of the first part [the owner], for and in consideration of the covenants and agreements hereinafter contained on the part of the party of the second part, to be kept and performed by the said party of the second part, does hereby charter, let, and hire to the said party of the second part the whole of the steamship Del Norte, now lying at the port of Seattle, her tackle, apparel, furniture, machinery, appurtenances, and appliances, for the term commencing on the 6th day of June, A. D. 1898, and extending to and including the 6th day of October, A. D. 1898. Said vessel to be employed during the term of this charter party in plying between the port of Seattle, Washington, and ports, islands, and places in the territory of Alaska."

The second article provides that the vessel shall be delivered to the charterer at Seattle in good order and repair. The third article declares that the owner shall protect the vessel from all liens and claims of liens on account of debts contracted prior to the date specified for her delivery to the charterer. The fourth article specifies the rent to be paid by the charterer, and the dates, places, and manner of payments, and provides that in case of nonpayment the owner may retake possession of the vessel. It also provides for the forfeiture in that event of a specified sum to the owner as damages. The fifth article declares that should the vessel receive such damage as to disable her, by reason of which the charterer is actually deprived of her use for the purpose for which he would otherwise have used her, no charter money shall be earned during the time of such deprivation, but that the wages and sustenance of the crew shall continue to be borne by the charterer, and that:

"In the event of the loss of said steamer from any cause, or in case said vessel shall from any cause be damaged to such extent as not to be worth repairing in the opinion of the master, this charter party shall immediately cease."

By the sixth article it is provided that the charterer shall not be liable for reasonable wear and tear of the vessel or her equipment, and that all damage to the steamer arising from collision, by reason of

stranding, fire, perils of the sea, and inevitable casualties, shall be borne by the owner. The seventh article contains the agreement of the charterer to deliver to the owner the vessel and her equipment at the termination of the charter party in good order, subject, however, to the provisions of the sixth article, and also with the provision concerning the making good of any shortage in the furnishings of the vessel. By the eighth article it is declared that the charterer shall have full charge of the vessel during the continuance of the charter-party, and shall pay all bills and other expenses incurred in her operation (including the wages of the master, officers, and crew thereof), except such as are in the sixth article specifically excepted, and that all earnings of the vessel, of whatever character or description, during the term specified, shall belong to the charterer and inure to his sole benefit, and that before the ship shall be permitted to leave the port of Seattle on any voyage during the continuance of the charter party, or before she shall be permitted to leave any other port on Puget Sound which may be the point of commencement of any voyage during the continuance of the charter party, all debts contracted by the charterer for stores, supplies, or any other matter or thing whatever purchased for the use or operation of the ship, shall be fully paid, such payment to be evidenced only by a certificate to that effect signed by the master and steward of the vessel, and that the charterer shall also, prior to the beginning of any such voyage, deposit in the Puget Sound National Bank at Seattle a sum not less than $1,500, subject to the check of C. E. Allen, the master of the vessel, as security for the payment of the crew thereof, and that, unless the crew of the vessel shall be paid within 24 hours after her arrival in port and the termination of any such voyage, the master shall have the right to check out of the bank mentioned the whole of the above-named sum, or such portion thereof as may be necessary to pay and satisfy the wages of the crew in full for such voyage. The ninth article provides that the owner shall have the naming and appointing of the master, chief engineer, and the steward of the vessel, those officers "to be in all respects under the order and direction of the second party," and shall receive from the charterer wages at not less than certain specified sums, to be paid to them at the end of each month, or at the end of the voyage, as may be agreed upon with such officers, and that in case the charterer shall be dissatisfied with the conduct of the master, chief engineer, and steward, or either of them, the owner, on receiving written notice from the charterer of such dissatisfaction and the particulars of the reason or reasons therefor, shall remove the officer so offending (if upon investigation such complaint shall be found to be justified), and shall appoint another or others in the place and stead of the one or more of said officers as shall be removed. By the tenth article the charterer agrees not to load on the vessel any cargo that will render her liable to forfeiture or fine under the laws of the United States, and that the vessel shall not, during the term of the charter party, violate any of the revenue, maritime, or shipping laws of the United States, or of any other power or government, and that, in case of any dispute arising between the master and charterer regarding the stowing of cargo or the amount of freeboard, such dispute shall be left to and determined

by a competent marine surveyor at the port at which the vessel is loading, whose decision shall be final. By the eleventh article the charterer covenants to pay, at the times and in the manner specified, the sums agreed upon, and not to assign the charter party or sublet the vessel without the written consent of the owner, and at the expiration of the charter party to deliver the vessel at the port of Seattle to the owner in as good order and condition as she now is, reasonable wear and damage by reason of the casualties mentioned in the sixth article hereof only excepted, and that, in case the charterer shall fail, neglect, or refuse to pay, at the times and in the manner specified, the sums agreed upon for the use of the vessel, or any part thereof, or shall fail to pay, at the times and in the manner specified, any of the bills or expenses of the operation of the vessel, including the wages of the master, officers, and crew thereof, or shall fail to deposit in bank for the payment of the wages of the master, officers, and crew, the sums of money agreed upon and determined, and in the manner specified, the owner shall have the right to consider the charter party forfeited, and to retake possession of the vessel, wherever she may be, with or without legal process, and that the master shall, upon receiving notice of any such default, or upon any such default coming to his notice, have the right to, and it shall be his duty, at the request of the owner, or his agent or attorney, to hold possession of the ship for and as the representative of the owner, but that no such claim of forfeiture or taking possession of the ship shall release the charterer or any security by him given from the payment of any portion of the rent agreed to be paid, or from the payment of any bills or expenses contracted in the operation of the vessel, and that, should the vessel be libeled for any matter or thing occurring subsequent to the receipt by the charterer of the possession of the ship under the charter party, he will, within 24 hours after the vessel is so taken into custody, cause her to be released by himself furnishing the necessary bond and sureties thereon for such release. By the twelfth and last article of the charter party it is provided that the vessel may be used during the continuance of the charter party for the purpose of towing barges and vessels from Puget Sound to ports, islands, and places in Alaska, but that in all cases the master shall have the right to determine the number of barges or vessels to be towed and the amount of cargo to be placed thereon, and shall have the right at any time to abandon any tow in the charge of the vessel when in his judgment the safety of the chartered ship requires it, and that no liability whatever shall attach to the owner by reason of any such abandonment; "it being understood and agreed, however, that such master is expected in all cases to use due diligence for the protection of any tow that may be placed in his charge."

By the supplemental agreement of June 10, 1898, the owner agrees that the ship may, at the option of the charterer, during the continuance of the charter party, be employed to carry freight or live stock and passengers between the west coast of Alaska and the eastern coast of Siberia, provided that safe ports must be used, and that the vessel shall not be required by the charterer to land freight or passengers at any port or place which may in any way endanger the

ship, her master to be the judge of the safety of any such landing-place, and his determination in such matter to be final and conclusive upon the parties to the agreement, in consideration of which the charterer agrees to deposit in the Puget Sound National Bank of Seattle, as security for the payment of the wages of the master, officers, and crew of the ship, the sum of $3,000 in lieu of the sum of $1,500 agreed upon in the charter party, said deposit to be subject to the same terms and conditions as the deposit of $1,500 mentioned in that instrument; and the charterer for the same consideration agrees that the earnings of the ship in the trade between Alaska and Siberia shall be collected and retained by the master, who shall account therefor to the parties to the agreement, it being understood and agreed that the master shall have the right to apply such earnings, or any part thereof, to the payment of any rent due under the charter party or any debts contracted in the operation of the ship, and that, in case any such rent or any such debts be not paid by the charterer, it shall be the duty of the master to so apply the said earnings, and that the charterer will pay any additional or increased insurance premiums that may become necessary to properly protect the vessel by insurance on account of entering into the trade between Alaska and Siberia.

It is thus seen that by the contract of the parties the entire ship was let to the charterer, and the ship delivered to him, under the express and distinct agreement that he should have full charge of her; that all of the officers of the vessel, including those that it was stipulated should be appointed by the owner, should be "in all respects under the order and direction" of the charterer; and that all of the earnings of the vessel during the term, of whatever character, should belong to the charterer and inure to his sole benefit. These facts leave no room for doubt that not only the possession, but the entire control, of the ship and of all of its officers passed by the agreement of the parties from the owner to the charterer. In further confirmation of this conclusion is the covenant on the part of the charterer in the eleventh article to deliver the vessel at the expiration of the charter party to the owner at the port of Seattle in as good order and condition as she was in at the time of the agreement, reasonable wear and damage growing out of the casualties mentioned in the sixth article only excepted. As a matter of course performance of that covenant on the part of the charterer necessarily presupposed that during the life of the charter the vessel should be in the possession of the charterer.

It is contended on behalf of the appellant that the agency of the master and steward for the owner is "conclusively established" by that provision of the eleventh article of the charter party wherein it is stipulated that, for failure to pay the rent or wages agreed to be paid by the charterer, the master should, upon receiving notice of such default, at the request of the owner, take and hold possession of the vessel "for and as the representative of the party of the first part [the owner]." The correct inference to be drawn from this provision is the direct opposite of that drawn by appellant's counsel; for the provision that the master should take and hold possession of the vessel as the representative of the owner upon the happening of the specified condition necessarily implies that prior to the happening of the desig-

nated contingency he was holding possession as the representative of somebody else,—the charterer,—which is in entire accord with the other provisions of the contract.

We are of the opinion that neither the master nor the steward of the ship can be properly regarded as the agent of the owner during the life of the charter party in question, and therefore that the owner cannot be held liable for the alleged wrongful acts of its officers. These views will be found to be supported by the cases of Gracie v. Palmer and U. S. v. Shea, above cited; Drinkwater v. Spartan, Fed. Cas. No. 4,085, 1 Ware, 145; The Aberfoyle, Fed. Cas. No. 16, Abb. Adm. 242; Winter v. Simonton, Fed. Cas. No. 17,894, 3 Cranch C. C. 104; Posey v. Scoville (C. C.) 10 Fed. 140; Donohoe v. Kettell, Fed. Cas. No. 3,980, 1 Cliff. 135; The Bombay (D. C.) 38 Fed. 512; American Steel Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964.

The judgment is affirmed.