GOLCAR S. S. CO., Limited, v. TWEEDIE TRADING CO.

(District Court, S. D. New York. April 24, 1906.)

1. SHIPPING—CONSTRUCTION OF CHARTER—PAY OF WINCHMEN.

By an express provision of a charter party requiring the ship to provide men to work the winches, she assumed the risk of any difficulty, not created by the charterer, which might prevent the use of her own crew for such purpose at any of the ports where she might rightfully be required to go, and is liable for the cost of extra winchmen which it became necessary to hire because the stevedores at certain ports refused to work with any winchman from the crew, although there were such men who were competent.

2. SAME—DEMISE OF SHIP—LIABILITY FOR CARGO STORAGE.

A charter of a vessel at a monthly hire for vessel and crew which provided that "the captain (although appointed by the owners) shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading or otherwise complying with the same" constituted a demise of the ship, and not a contract of affreightment with respect to the cargo as to which the charterer became the owner of the ship pro hac vice, and he cannot recover from the owner for a shortage in delivery.

[Ed. Note.—Demise of vessel, see note to The Del Norte, 55 C. C. A. 225.]

3. SAME—HARTER ACT.

The provision of section 2 of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) making it unlawful for the owner of a ship "to insert in any bill of lading or shipping document any covenant or agreement * * * whereby the obligations of the master, officers, agents or servants to carefully handle and stow her cargo, and to care for and properly deliver the same shall in anywise be lessened, weakened, or avoided," relates to contracts between carrier and shipper, and does not apply to a charter party by which a ship is demised.

[Ed. Note.—Limitation of liability of shipowner, see note to The Longfellow, 45 C. C. A. 387.]

In Admiralty. Suit to recover charter hire.

Convers & Kirlin, for libellant.
Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by the Golcar Steamship Company, Limited, to recover from The Tweedie Trading Company, certain hire said to be due for the services of the steamship Cape Corrientes, under charter dated July 24, 1903. The amount of hire claimed, after allowing for certain offsets, was $1449.10 and there was a further claim of $267.30 alleged to be due because of a deficiency of coal on board the steamship when re-delivered on the 8th of October, 1903. The answer denied that there was anything due, but it was subsequently stipulated that the libellant was entitled to recover damages sustained by reason of the matters alleged in the libel and it was referred to a commissioner to ascertain the amount. He has

reported that the libellant is entitled to recover the sum of $1537.27, with interest, per the following account:

| | | |
|---|---|---|
| Hire for term of charter, | | $6,228 51 |
| Damages for breach of coal clause, | | 267 30 |
| | | $6,495 81 |
| Less the following: | | |
| Payments on account of hire | $3,337 03 | |
| Advances admitted in libel | 125 55 | |
| Value of 300 tons of coal on board on re-delivery | 1,458 00 | |
| Consular fees | 1 82 | |
| Noting protest | 1 82 | |
| Translating provision list | 6 00 | |
| Winchmen at Rio Grande do Sul, | 10 02 | |
| Winchmen at New York, | 20 30 | |
| | | $4,960 54 |
| | | $1,535 27 |

The libellant excepted to the report because of the allowance of items, as follows:

"(a) 7s. 6d. ($1.82) Consular fees for noting protest at Pernambuco.
(b) 25,000 milreis ($6.00) for translating the provision list.
(c) 58.250 milreis ($13.98) for winchmen's time at Rio Grande do Sul.
(d) $20.30 for winchmen's time at New York."

The respondent also excepted to the report, as follows:

"1. Because the Commissioner found that the respondent was not entitled to deduct claims paid because of the failure of the ship to deliver at the port of destination all the cargo laden on board (Commissioner's Report, pp. 28-42).

The Commissioner held as a matter of law that the charter was a demise of the ship and constituted the charterers owners pro hac vice and was not a contract of affreightment. This was error in view of the terms of the charter party."

The questions involved require consideration of various provisions of the charter party, as follows:

"1. That the Owner shall provide and pay for all provisions, wages and Consular shipping and discharging fees of the Captain, Officers, Engineers, Firemen and Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

2. That the Charterers shall provide and pay for all the Coal, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the captain, officers or crew), and all other Charges whatsoever, except those before stated.

4. That the Charterers shall pay for the use and hire of the said Vessel (£630) Six Hundred and thirty Pounds British Sterling per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery in like good order and condition to the Owners (unless lost) at a port in the River Plate, at charterers option.

7. That the cargo or cargoes to be laden or discharged in any dock or at any wharf or place that the Charterers or their Agents may direct, provided the Steamer can always safely lie afloat at any time of tide.

8. That the whole reach of the Vessel's Holds, Decks, and usual places of loading, and accommodation of the Ship (not more than she can reasonably

stow and carry) shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel.

9. That the Captain shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with Ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and direction of the Charterers as regards employment, agency, or other arrangements; and the Charterers hereby agree to indemnify the Owners from all consequences or liabilities that may arise from the Captain signing Bills of Lading or otherwise complying with the same.

10. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

11. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the steamer and see that voyages are prosecuted with the utmost dispatch. He to be furnished, free of charge, with first-class accommodations, and same fare as provided for Captain's table.

12. That the Master shall be furnished from time to time with all requisite instructions and sailing directions, and shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or Agents.

13. That the Master shall use all diligence in caring for the ventilation of the cargo.

16. That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the Vessel for more than twenty-four consecutive hours, the payment of hire shall cease until she be again in an efficient state to resume her service; but should the Vessel be driven into port or to anchorage by stress of weather or from any accident to cargo, such detention or loss of time shall be at the Charterer's risk and expense.

17. That should the Vessel be lost, freight paid in advance and not earned (reckoning from the date of her loss) shall be returned to the Charterers. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and Errors of Navigation, throughout this Charter Party, always mutually excepted.

19. That the Owners shall have a lien upon all cargoes, and all sub-freights, for any amounts due under this Charter, and the Charterers to have a lien on the Ship for all moneys paid in advance and not earned.

23. That the Owners are to provide ropes, falls, slings and blocks necessary to handle ordinary cargo up to two tons (of 2,240 lbs. each) in weight, also lanterns for night work.

24. Steamer to work night and day if required by Charterers, and all steam winches to be at Charterers' disposal during loading and discharging, and Steamer to provide men to work same both day and night as required, Charterers agreeing to pay extra expense if any incurred by reason of night work, at the current local rate."

With respect to the libellant's exceptions the commissioner said, referring to the sums disputed, as follows:

"4. Mr. Tweedie testified that he paid 58,250 milreis ($13.98) for winchmen's time at Rio Grande do Sul, and a bill against the ship, dated Rio Grande do Sul, October 6th, 1903, was put in evidence, containing a statement, day by day, of the number of hours the winches were used (83½ hours), and time spent by tallymen (33 hours). Tallying was a port charge to be borne by the charterer. Deducting this, the claim for winchmen is $10.02. The master said that there was a rule among the stevedores at Rio Grande do Sul not to work with winchmen from a ship's crew, and they refused to work with his men, although in his experience at other ports the winches were driven by members of the crew. Clause 24 of the charter party was as follows: 'Steamer to work night and day if required by Charterers, and all steam winches to be at Charterers'

disposal during loading and discharging, and Steamer to provide men to work same both day and night as required. Charterers agreeing to pay extra expense if any incurred by reason of night work, at the current local rate.' This permitted the use of winchmen taken from the crew if they were competent, and there is nothing to indicate that the men offered by the vessel were not competent to do the, work required of winchmen at Rio Grande do Sul. It is a fair presumption that the stevedores were governed by some trades union rule, or jealousy of foreigners, or caprice or local sentiment. Libellant argues that it was the charterer's duty to furnish and pay stevedores, and that if the char-terer employed stevedores who were unwilling to work with competent men from the ship the extra expense should be borne by the charterer. But I think that by the positive engagement of the ship to 'provide men to work' the winches, she assumed the risk of any difficulty, not created by the char-terer, which might prevent the use of her own crew for such purpose at any ports to which it was agreed she might be sent by the charterer. The only engagement which the charterer made in regard to winchmen was to pay the extra expense of the night work, if any.

5. There was a similar item of $20.30 for winchmen's time at New York, where case oil was loaded. The testimony as to this is more definite. The foreman stevedore testified that it is customary at this port to employ winch-men outside of the crew in loading case oil, because the speedy manner in which the work is done demands a higher degree of skill than men from the crew possess, and the stevedores refuse to work when the winches are run by mem-bers of the crew, believing that their personal safety is imperilled unless more skillful winchmen are employed."

This seems to be a satisfactory explanation of the allowance of these items and the libellant's exceptions are overruled.

The controversy respecting the respondent's exception is more im-portant, but it has been fully, and I think correctly, treated by the com-missioner. His opinion in this connection is as follows:

"Shortage Claims.

Mr. Tweedie testified that he paid three claims for cargo that had been laden on board but not delivered.

These claims, amounting to about $60, are interposed by respondent as set-offs, although they are not pleaded in the answer. The chief mate says that there were shortages at Pernambuco and Rio Grande do Sul according to the bills of lading and manifest. He personally tallied out at Rio Grande do Sul, and his junior officers at the other ports. He could recall a small cask of butter and a case of residuum oil as missing at Pernambuco, and two cases supposed to contain small hand trucks at Rio Grande do Sul, but he also says that all cargo was delivered that came aboard. There is no proof that the articles paid for were received by the ship, nor are the circumstances of the settlement shown, but counsel desire me to pass on the question of law, and have made a stipulation which provides, in effect, that I may assume the payments were actual settlements for actual shortages, and may determine respondent's right to offset them notwithstanding they have not pleaded, and without regard to any objections that may have been taken during the refer-ence; and if my decision is in favor of respondent, the reference shall be re-opened to permit and require respondent to make proper legal proof of the facts of the short deliveries and of the settlements; but if it is in favor of libellant, no further proof is to be taken on the subject. This is without prejudice to either party's right to except to my report on the question so decided.

Counsel for libellant concedes that if the charter was a contract of affreight-ment, the claim would be proper set-offs, but maintains that there was a demise of the ship, and he refers to the terms of the charter as sustaining his contention. The charter is to the effect that the owners 'agree to let,' and the charterers 'agree to hire' the ship from the time of delivery, for one trip, etc., the charterers 'to have liberty to sublet' her for all or any part of the charter

term. She is to be placed 'at the disposal of the charterers' at the port of delivery, to be employed in carrying lawful merchandise on conditions which are set forth. These conditions, so far as they bear on the question, are as follows:"

(These are quoted above and need not be repeated.)

"These clauses, libellant contends, constitute a hiring of the ship as a vehicle which the charterer is to use in carrying cargo on his own account, and clearly indicate that as between the parties the charterer assumes all the obligations of a common carrier, and that the master is the agent of the charterer in carrying out the commercial arrangements which concern the charterer's business, although a third person holding a bill of lading could make the ship liable in rem for a shortage. Reference is made to the fact that under an affreightment contract the dunnage and shifting boards would ordinarily be furnished by the owner, while here the charterer provides them, and to the provision requiring the owner to supply ropes, falls, etc., which, it is argued, it would be unnecessary to mention in a contract of affreightment; and stress is laid upon the various charges imposed upon the charterer that are ordinarily borne by the owner in a contract of affreightment, and which the owner pays out of the freight; while here all the cargo space is placed at the disposal of the charterer, the freight all belongs to the charterer, and the owner gets the hire whether freight is earned or not. Special dependence is placed upon the 9th clause. Libellant's counsel cites, in support of his position, Young v. Lehmann, (D. C.) 27 Fed. 383, The Alert, (D. C.) 40 Fed. 836; Ceballos v. The Alert, (D. C.) 44 Fed. 685; and 61 Fed. 113, 9 C. C. A. 390; The Centurion, (D. C.) 57 Fed. 412; Worrall v. Davis Coal & Coke Co., 122 Fed. 436, 58 C. C. A. 418; The Endsleigh (D. C.) 124 Fed. 858, and Auten v. Bennett, a very recent decision of the New York Court of Appeals, reported in the Law Journal of February 16, 1906 (76 N. E. 609). In the first of these cases, the ship had been chartered to respondent and carried a cargo of iron for him. The charter contained a provision that the cargo should be discharged at 'such wharf or place as may be ordered by the consignee on arrival.' Judge Brown held that the ship's agents acted as the agents of the consignee, and not of the ship, in selecting a wharf at the request of the consignee, and that the consignee could not offset against the freight the value of a portion of the cargo which fell into the water by the breaking down of the wharf because of its insufficient strength; the loss not arising from any unreasonable or improper use of the wharf, such as overloading or an improper distribution of cargo, in other words, the ship's own negligence. Both sides admit that in The Alert, supra, the form of charter was the same as in the present case. That was a suit against the ship for damage to cargo by the breaking of tackle while discharging, and in 40 Fed. Judge Brown, having made an order bringing in the charterers on the application of the owner, on the ground that the charterer furnished the tackle under a special agreement, discussed and sustained this practice, and said among other things;" (837) "'The charterers were in possession of the ship; they were the owners pro hac vice; they were the principals in the contract. The bill of lading was their obligation, not that of the master, who protested against such cargo, and no fault appears in the ship or master. The owners of the ship, who have been obliged to interpose as claimants to prevent the sacrifice of their property, and the master, are under no personal responsibility. They are strangers to the contract sued on, and without any certain means of ascertaining the facts, or producing the evidence of them. Upon the case, as thus far presented, if the ship is liable, the charterers are also liable, and bound to indemnify the claimants.' In 44 Fed. Judge Brown, after the trial of the cause, ordered a decree in favor of libellant against the ship, but the evidence not being clear on the question between the owner and the charterer, directed that the case continue as between them. In 61 Fed. this disposition of the case was affirmed on appeal. It was there argued that the charterer, being deemed to be owner, was alone responsible; also, that if there was a liability on the part of the ship, the decree should have provided that the libellant should collect of the charterer in the first instance, and the deficiency, if any, from the ship. The court said:" (115) "'An attempt was made to support the second and third

points, and to assert that a chartered vessel was not liable upon contracts of affreightment made by a special owner, but, in view of the law upon the subject as stated by Mr. Justice Curtis in The Freeman v. Buckingham, 18 How. (U. S.) 182, 15 L. Ed. 341, that branch of the case requires no further comment.' Respondent, however, contends that this case, instead of being an authority in favor of libellant, is in favor of respondent, and points out that it is only because of the special agreement referred to that the charterer was held bound to indemnify the owner, and that the inference is that in the absence of this special agreement no such obligation would have been imposed upon him. In The Centurion, the libel was filed to recover for a portion of a cargo lost through bad stowage, and the charterer was brought in by the shipowner as in The Alert, on the ground that the stowage had been done by the servants of the charterer, who was bound to pay any damages arising therefrom and to indemnify the owner. Judge Brown held that it was immaterial that the bills of lading were signed by the charterer's agent, and ordered a decree against both ship and charterer, but directed that the damages should be collected in the first instance from the charterer, who was bound to indemnify the ship. He said:" (415) " 'The charterers by the terms of the charter became the owners pro hac vice as respects all matters pertaining to the handling and delivery of cargo ; but not as regards the navigation of the ship, for which, under the expressed terms of the charter, the owners remained the responsible principals.' The charter was apparently on a form similar to that in suit here, except that it contained a provision that" (413) " 'no claims be made against owners for loss of cargo,' which he held was a stipulation between charterers and owners adjusting their liabilities as between themselves. This case was reversed on appeal (68 Fed. 382, 15 C. C. A. 480), but on the ground that the cargo was properly stowed and the damage arose from excepted perils of the sea. The Endsleigh has been referred to supra, and sustains libellant's contention, as do Auten v. Bennett and the decision of Lord Ellenborough in Trinity House v. Clark, 4 Maule & S. 288, 298, therein referred to. In Worrall v. Davis Coal & Coke Co., Judge Wallace construing a clause similar to the 9th quoted above, said:" (438) " 'We are unable to assent to the proposition that the master was in such sense the agent of the charterer that he is not to be considered as sustaining any duty to the owners in doing those things while the vessel was in possession of the charterer which its safety and preservation from unnecessary injury required to be done. The agency clause places him under the direction of the charterer as regards the business engagements the latter may choose to enter into for the employment of the vessel, but not under the charterers' orders in the immediate navigation and care and custody of the ship. The owners' undertaking to maintain the vessel in a thoroughly efficient condition at all times during her employment is inconsistent with any other conclusion.'

Respondent maintains that the charter was a contract of affreightment, and relies upon The Alert, which has already been referred to, and The Shadwan, the latter case particularly, as reported in 49 Fed. 379, affirmed on the opinion of Judge Brown 55 Fed. 1002, 5 C. C. A. 381; and in a brief submitted in another cause in which this question was argued, counsel refers to other cases which he contends sustain his claim. The Shadwan was a suit by the owner against the charterer for hire, and the principal question was one of deviation and detention, but there is a brief reference to a counterclaim setting up a small item of damage for misdelivery of part of the cargo. As to the latter, Judge Brown merely says" (383) "that the vessel was liable, 'no sufficient ground being shown to absolve her from that risk.' Libellant maintains that little weight should be given to this decision, as slight attention was paid to the question, and neither in the District Court nor in the Circuit Court of Appeals was it argued in the briefs. In The Craigallion (D. C.) 20 Fed. 747, (Dist Ct. Md.), another case cited by respondent, the ship was held liable under a similar charter because of neglect to close the hatches over a cargo of fruit when the temperature had fallen, whereby the cargo was chilled and injured. The master had been cautioned to protect the cargo against such injury before sailing. Judge Morris held that there was a failure to perform one of the usual and proper duties of those in charge of the navi-

gation of the ship. This decision is criticised in The Del Norte (D. C.) 111 Fed. 542 (Hanford, J.), in which the charter was held to be a demise of the ship. In that case the charter contained a provision that the master, chief engineer and steward should be appointed by the owner, and they were to be 'in all respects under the orders and direction of the charterer,' and subject to removal on his complaint, if found to be justified. It was held that the vessel was not liable to the charterer for loss or damage occasioned by the malfeasance or wrongful acts of the master or steward while in the charterer's service, although the charter also contained a provision that on failure of the charterer to pay the hire the master should take and hold possession of the vessel 'for and as the representative' of the owners. Of The Craigallion, the court said:" (545) " 'It is enough to say that one decision by a district court sustaining a suit in rem against a chartered vessel by the charterer for damages to the cargo, caused by the negligence of the officers and mariners in the performance of their ordinary duties, as such, while the vessel was in the possession and control of the charterer, is not sufficient to outweigh the great weight of authority, which, in my judgment, established a fixed rule of law inconsistent with any right in an owner pro hac vice to hold the ship or her general owner liable to him for losses attributable to torts or crimes of the master or crew. The Daniel Burns (D. C.) 52 Fed. 159. And the charterer is owner pro hac vice where the master is subject to his orders and directions, though appointed to his position as master by the general owner. The India (D. C.) 14 Fed. 476; The Bombay (D. C.) 38 Fed. 512. In such a case the charterer is himself responsible for the torts of the master, because, having a legal right to control, he is legally presumed to actually control, the master's conduct. On the other hand, the general owner is not responsible, because he does not have the right to control the master in the performance of his duties. Wood, Mast. & S. § 281.' This decision was affirmed by the Circuit Court of Appeals, 9th Circuit, 119 Fed. 118, 55 C. C. A. 220. To the same effect is The Bombay (D. C.) 38 Fed. 512, in which reference is made to a clause identical with the 9th in the charter in the present case, and it is said:" (514) " 'But in this case the matter as to the party in whom command, possession and control should be vested is not left to inference, but is settled by the clause in the charter party last quoted.' The India (D. C.) 14 Fed. 476 (Judge Benedict), and 16 Fed. 262 (Judge Wallace), is cited as sustaining the conclusion; and it is undoubtedly to the same effect. I do not consider that Bethel v. Mellor (D. C.) 131 Fed. 129; Birt v. Hardie (D. C.) 132 Fed. 61, The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954, and Leary v. U. S., 14 Wall (U. S.) 607, 20 L. Ed. 756, all cited by respondent, are at variance with the cases last referred to. In Wier v. Union S. S. Co., 9 Asp. Mar. C. 13, 9 Id. 111, there are expressions by most of the judges to the effect that a charter like the present does not constitute a demise of the ship. But the English decisions seem to be in some confusion on the subject (See Carver on Carriage by Sea [4th Ed.] pp. 148–156, where the cases are compiled). This writer says, however (page 149), 'Contracts in which the possession of the ship is handed over to the charterer are very much less frequent. But they are at times made, and occasionally in such doubtful shapes that it is difficult to tell whether, in fact, the possession does or does not pass to him. But when that does take place, so that the charterer, and not the owner, is in actual control of the ship, it cannot properly be said that the relation between the owner and the charterer is that of carrier and freighter. And that is still true, though the owner may have contracted to make and keep the ship fit for the work, and to provide her necessary stores, and even though he may also have undertaken to supply and pay the crew.'

By the weight of American authority, it seems to me that the charter in this case operated as a demise of the ship, but with a continued responsibility on the part of the owner for her proper navigation and maintenance. Under The Endsleigh and The Del Norte, supra, it would seem that the owner would not be liable even if the master or crew misappropriated the cargo. Respondent's counsel argues that if this is the law, the crew may broach cargo with impunity. But the risk of theft or other misappropriation by the crew is always assumed by the carrier of goods, and the offense could no more be com-

mitted with impunity where the goods are carried for a charterer as owner pro hac vice than where they are carried by the legal owner under a contract of affreightment. The master is under the same obligations to protect the cargo in either case, and the crew are subject to the same punishment for theft; and by the 11th clause of the present charter the charterer has a right to appoint a supercargo to safeguard his interest. The mischief which it is argued would result if such charters be construed as demises is fanciful, I think. The shortages in question are more likely to have resulted from loss in loading or discharging or in tallying than in any other way, and in such event libellant would not be liable to respondent, since loading, discharging and tallying are all part of the charterer's obligations under this charter.

Respondent invokes the Harter Act, to all the terms, provisions and exemptions of which the charter is made subject by clause 25. By section 2 of the act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946] it is made unlawful for the owner, master, agent or manager of the ship 'to insert in any bill of lading or shipping document any covenant or agreement whereby the obligation of the owner or owners of said vessel to exercise due diligence, properly equip, man, provision and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents or servants to carefully handle and stow her cargo and to care for and properly deliver the same, shall in any wise be lessened, weakened or avoided.' It is argued that the charter is a shipping document within the meaning of this act, and if it could otherwise be construed as relieving the ship and owner for non-delivery of cargo as between the owner and the charterer, the act precludes such construction. If this be so, it would have that effect whether referred to in the charter or not. But I do not think that it applies, or that the present case is within the policy or the purpose of the act. The prohibition, in my judgment, was intended to prevent restriction of liability to the prejudice of shippers of goods under contracts of affreightment, and did not contemplate a regulation of the terms and conditions on which an owner might lease his ship to another as one would lease a house. The owner referred to in the act is the carrier, and where a charterer is owner pro hac vice, the prohibition applies to him in his contracts of affreightment, whether made by him personally, or by the master or another person as his agent. This appears to be in harmony with The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, and The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130. If the construction which the respondent puts upon the act be correct, then a ship owner who absolutely surrenders command, navigation and control of his ship to another, reserving no voice whatever in her management, cannot lawfully stipulate with the charterer that he shall be free from all liability to him arising out of the business of the ship while she is run by the charterer.

I therefore disallow the claims for shortage."

Nothing can, in my judgment, be profitably added to the commissioner's discussion, which, with the conclusion, seems to be well sustained by the authorities cited.

This exception is also overruled, and the report will be confirmed.